LEASCO DATA PROCESSING EQUIP-MENT CORPORATION and Leasco World Trade Company (U.K.) Limited, Plaintiffs,

v.

Robert MAXWELL et al., Defendants, and Saul P. Steinberg et al., Additional Parties With Respect to Counterclaim.

No. 69 Civ. 4790.

United States District Court, S. D. New York.

Jan. 9, 1974.

Willkie, Farr, & Gallagher, New York City by Anthony F. Phillips, New York City, for plaintiffs Leasco Data Processing Equipment Corp. Leasco International N. V.

Curtis, Mallet-Prevost, Colt & Mosle, New York City by Howard C. Buschman, III, Peter K. Leisure, New York City, for defendants Robert Fleming & Co. Limited Robert Fleming Inc.

Shaw, Bernstein, Scheuer, Boyden & Sarnoff, New York City, for defendants Robert Maxwell M.C.M.P.

Nickerson, Kramer, Lowenstein, Nessen, Kamin & Soll, New York City by Charlotte Fishman, Jamaica, N. Y., Maurice N. Nessen, New York City, for defendants Maxwell Scientific International Inc., Ithmus Enterprises Inc., M. S. I. Publishers Inc., Robert Maxwell & Co. Limited and the Trustees of the DePfyffer Settlement, Maxwell Scientific International (Distribution Services) Ltd.

Wachtell, Manheim, & Group, New York City, for defendant Heusser & Cie.

## MEMORANDUM OPINION

ROBERT L. CARTER, District Judge.

*The Nature of the Action:*

This is an action asserting liability under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5, 17 CFR 240.-10b–5, issued thereunder. Jurisdiction is invoked under Section 27 of the Act, 15 U.S.C. § 78aa.

The basic claim being pressed by plaintiffs is that defendants, including Kerman, conspired to deceive and defraud them; that defendants made false, fraudulent and misleading representations to plaintiff, Leasco Data Processing Equipment Corp. ("Leasco"); that in reliance on these false and fraudulent representations, Leasco, on June 17, 1969, was induced to enter into an agreement signed by defendant Robert Maxwell on his own behalf and on behalf of all other defendants to make a tender offer to purchase "all the outstanding ordinary shares" of Pergamon Press Ltd. ("PPL"); and that in antici-

pation of the tender offer, Leasco bought 38% of PPL's outstanding shares over the London Stock Exchange at an expenditure of approximately 22 million ($22,000,000) dollars; that Leasco was misled by false and fraudulent misrepresentations both oral and written, in New York and England, concerning the financial health of PPL and its subsidiaries; that prior to making the tender offer, but after the expenditure of 22 million dollars for the purchase of PPL stock, plaintiffs learned of the deception and refused to go forward with the agreement; that when this decision was made public, trading in PPL shares over the London Stock Exchange was suspended, an inquiry into the affairs of PPL was undertaken by the British Board of Trade; that Maxwell and Kerman were removed as directors of PPL and this litigation followed. Maxwell counterclaims alleging a conspiracy by Leasco to defraud him and to depress the market value of PPL stock in order for Leasco to acquire control of the company. Kerman moves to dismiss for lack of jurisdiction.

*Prior Proceedings:*

Kerman is a British national, resident in London, and a member of Forsythe, Kerman & Phillips, a firm of solicitors with offices in London. He was, during the relevant period encompassed by this action, an outside director of PPL, a British corporation; of Pergamon Press, Inc. ("PPI"), an American subsidiary of PPL with offices in New York; and of International Learning Systems Corporation, a British subsidiary of PPL. Kerman, in reliance upon Rule 12(b)(3) of the Federal Rules of Civil Procedure ("Fed.R.Civ.P."), moved to dismiss for lack of *in personam* jurisdiction. The motion was granted by this court (Lasker, D. J.) in an opinion filed on September 16, 1970 and reported at 319 F.Supp. 1256. The court's determination was issued as a final judgment pursuant to Rule 54(b), Fed.R. Civ.P.

The Court of Appeals reversed, 468 F.2d 1326 (2d Cir. 1972), alleging at 1343, 1344 that "[T]here were too many unresolved questions of fact to make it proper for the judge to take the important step of dismissing Kerman as a defendant on the basis of the conflicting affidavits before him." At that time Kerman had not answered various of plaintiffs' interrogatories, and the Court stated that while these answers "may do little to advance plaintiffs' case, plaintiffs are at least entitled to have them answered . . . and to have the issue of personal jurisdiction decided in accordance with the principles stated in this opinion." *Ibid*. The Court further indicated that plaintiffs should be "allowed to take the depositions of Di Biase and Maxwell, on points relevant to personal jurisdiction over Kerman, upon written questions if they so desire and to offer oral evidence on the subject." *Id*. at 1344 n. 12.

*Renewal of Motion to Dismiss:*

The plaintiffs have now had their outstanding interrogatories answered by Kerman and with the permission of the court have taken his deposition as well. They have also taken the depositions of Maxwell and of Paul Di Biase, a law partner of Kerman's, who participated in the June 1969 negotiations between Leasco and Maxwell which culminated in the disputed agreement. Kerman renews his motion to dismiss again asserting a lack of *in personam* jurisdiction. In addition to the above answers to interrogatories and depositions upon which both parties rely in support of and in opposition to the motion, portions of the depositions of Bernard Schwartz and Saul Steinberg, Leasco officials, the answers of Robert Fleming & Co. Limited and Robert Fleming, Inc. to plaintiffs' interrogatories and plaintiffs' answers to Fleming interrogatories, extracts from the June 2, 1971 report of the British Board of Trade, and various and sundry other documents, including minutes of board meetings of PPL and

PPI, registration statements of PPI, various communications of PPL, have been submitted to aid the court in deciding the motion.

For the reasons set forth below, I come to the same conclusion reached by this court on the original submission of this motion, that no case has been made for the exercise by this court of *in personam* jurisdiction over Kerman. Accordingly, the motion to dismiss is granted.

*Kerman's Role:*

As has already been stated, Kerman was a director of PPL, PPI and ILSI. It is clear and undisputed that he played no part in the day-to-day management of these companies. His last visit to the United States was in 1966. PPI is an American corporation with headquarters in New York; it held board of directors meetings in New York quarterly, but Kerman never attended any of these meetings. His sole direct contact with New York, aside from being on the board of a New York-based PPL subsidiary, was to sign an S–1 form and amendment in June and August of 1968 in connection with the issuance of PPI stock. He bought and still owns 500 shares of PPI stock which had been secured through a London broker.

The negotiations between Leasco and Maxwell began in the first half of 1969. On May 28 Bernard Schwartz and Michael A. Gibbs, Leasco representatives, visited PPL headquarters in Oxford, England. The next morning Schwartz, Gibbs, Maxwell and C. T. Clark, Maxwell's chief deputy and confidant, had wide-ranging business discussions. During these discussions Maxwell described the business of PPL, how it functioned and its various subsidiaries. Much of the discussion was dominated by Maxwell and Schwartz and the critical discussions took place between Maxwell and Schwartz alone.

On May 28 Maxwell called Kerman and asked him to attend a meeting of the PPL board in Oxford the next day,

rather than in London as originally scheduled. During this conversation Maxwell advised Kerman, without going into specific detail, that Leasco officials and he were discussing a possible merger; that representatives of Leasco would be at PPL headquarters on the following day; and that he was arranging a luncheon meeting of PPL directors and the visiting Leasco officials. This was the first Kerman learned of the negotiations. Indeed, until then only C. T. Clark had been told of Maxwell's discussions with Leasco.

On May 29 Kerman attended the PPL board meeting. He met Schwartz and Gibbs at lunch. During lunch Schwartz described and spoke of Leasco's interest in expanding into industries which would be dependent upon computer technology, and there was general talk about the possibility of a Leasco-PPL merger. Kerman spoke about Maxwell's brilliance, of PPL being a good company and that it might not be in PPL's best interest to sell at that time. He gave Schwartz the impression that he would not be disappointed if no merger took place. After lunch there was a tour of the premises. Kerman left before the luncheon meeting was over, and Schwartz states that Kerman's contribution to the business part of the discussion at lunch was limited.

The next day Maxwell alerted Kerman's partner, Paul Di Biase, who did PPL's corporate work, to be prepared to go to New York shortly. He did not tell him the reason. A day or so thereafter Maxwell told Di Biase that the reason he wanted him to go to New York was to assist in negotiations with Leasco for merger with PPL. Di Biase informed Kerman of the reasons for his forthcoming trip, and Kerman expressed skepticism about the trip, since, having recently met Leasco representatives, he did not feel the negotiations were serious.

Di Biase arrived in New York on June 13, and participated in the negotiations. He left at 1:30 a. m. on June 17 to re-turn to London. There is no evidence that either Maxwell or Di Biase represented or consulted Kerman during the New York negotiations. The only support for such representation or consultation is Steinberg's statement that Di Biase or Maxwell indicated that he had to check with Kerman. Steinberg concedes that this may have been a negotiation ploy and that he was given no concrete evidence that Kerman had actually been called. In answer to plaintiffs' interrogatories, Robert Fleming, Inc. states that Di Biase was present during the June negotiations in New York "representing Forsythe, Kerman & Phillips."

Di Biase arrived at Heathrow at about 10:00 a. m. on the morning of June 17 and went directly from the airport to his office in London. There he saw and spoke to Kerman. He had brought a draft copy of the Leasco-Maxwell agreement with him from New York. It was substantially in final form; some minor details were still being worked out when he left the negotiations. He advised Kerman of what had transpired, and it is fair to conclude that Kerman was then apprised of the substance of what was agreed upon—which was the essence of the final agreement. Later that day Maxwell called Di Biase to tell him that the agreement had been signed in New York and that Maxwell would be coming to London with Leasco representatives; that Rothchilds was preparing a press release to announce the merger and that Maxwell wanted Kerman to be present. Di Biase called Kerman and gave him the message.

Saul Steinberg made the trip from New York to London with Maxwell on June 17. He met Kerman for the first time on the morning of June 18 at Rothchilds. There Kerman and Maxwell, as directors of PPL, Steinberg and Hodes, representing Leasco, and representatives of Robert Fleming, Ltd. studied and approved a press release announcing the

Leasco-PPL merger. The next day there was a PPL shareholders meeting and a luncheon.

During this luncheon Maxwell suggested to Steinberg that it would be a good idea for Leasco to buy PPL stock on the London Stock Exchange prior to the tender offer called for in the agreement. Steinberg had the impression that Kerman gave support to this idea, but he cannot recall Kerman making any specific statement to that effect. He can only report a feeling that Kerman endorsed the idea. Steinberg and Kerman discussed PPI during the luncheon. Steinberg advised Kerman that all American business would be channelled through PPI. Kerman thought that was very good news and inquired whether he should buy more PPI shares.

*The June 17, 1969 Agreement:*

The agreement signed in New York on June 17, 1969, is between Leasco and Maxwell and provides for Leasco to purchase all outstanding PPL shares at 37 shillings per share. The offer was conditioned upon acceptance of not less than 51% of the approximately 13,000,000 outstanding shares. Maxwell and his interests owned 4,300,000 PPL shares. Maxwell agreed to accept the offer in respect of the shares owned by him and to procure acceptance from the Maxwell interests. Maxwell also agreed to recommend acceptance by PPL shareholders and to use his best efforts to have the PPL board of directors recommend acceptance of the offer. The press release issued on June 18, 1969 announcing the merger stated "[t]he quoted U. S. subsidiary of Pergamon, Pergamon Press, Inc., will not be affected by the proposed offer."

*No Basis For In Personam Jurisdiction Has Been Established:*

█ While it is clear that Kerman was never in New York during the course of these negotiations, he could be held to have brought himself within the personal jurisdiction of this court if he

committed in England any acts which he "must know, or have good reason to know . . . will have effects" in New York, and the resultant impact in New York must occur "as a direct and foreseeable result of the conduct outside" this country. *See* 2d Circuit *Leasco* opinion, *supra,* at 1341. What I understand this to mean is that Kerman must be shown to have performed some activity in England which he either knew at the time, or should have known, would directly contribute to the furtherance of the negotiations between Maxwell and Leasco in New York, and that the signing of the agreement in New York on June 17, 1969, was a direct and foreseeable consequence of this conduct.

The only act in England that Kerman did which could conceivably relate to or affect the Leasco-Maxwell negotiations was his meeting with Schwartz and Gibbs on May 29 at Headington Hill Hall in Oxford. That was his first meeting with Schwartz or Gibbs. He had just learned of the ongoing negotiations the day before. He did not know any of the details. After conversing with Kerman during luncheon on May 29, Schwartz felt that Kerman would not be unhappy if the merger did not go through. He did praise Maxwell to Schwartz; said that PPL was a good company and it was probably not a good idea for PPL to sell out at that time. There is nothing, however, to support any inference that at that point Kerman knew that Maxwell was misleading Leasco as to PPL's financial status. He had no detailed business discussions with Schwartz; indeed, Schwartz concedes that his contribution was limited. Most certainly, he could not be said to have cause to believe that his innocuous and generalized remarks, which were closer to social amenities than business discussion, would influence Schwartz or Gibbs in any way in their negotiations with Maxwell.

As to Steinberg's impressions of Kerman supporting Maxwell's suggestion on

June 19 to buy PPL stock over the London Stock Exchange, at best, this occurred after the agreement had been signed and the merger announced and, moreover, was only a subjective reaction. Steinberg can attribute no specific statement to Kerman on which this impression can be given objective support. This is hardly a viable peg on which to base an assertion of *in personam* jurisdiction over Kerman by this court.

Jurisdiction can be asserted on the acts of Maxwell and Di Biase in New York during the Leasco negotiations if it is established that either of these men acted as Kerman's representative, or through them he played a role in shaping the agreement. Maxwell, Di Biase and Kerman categorically deny any such representation; they deny that Kerman was consulted at all during the negotiations; Di Biase and Kerman deny that Kerman in any way exercised supervisory control over Di Biase's handling of corporate matters for PPL or the June negotiations. Fleming states that Di Biase was present in New York representing Kerman's law firm; but that answer, standing alone, cannot be stretched to encompass more than what we already know; that Di Biase was a partner in the firm.

Steinberg asserts that either Di Biase or Maxwell announced during the June negotiations that he (Di Biase or Maxwell) had to contact Kerman, but he has no concrete evidence that any such contact was in fact made. The Court of Appeals pointed out in *Leasco, supra,* that there was no proof offered in respect of telephone records to show any calls being made to Kerman from New York during the period in question. No such proof was offered in opposition when the motion was submitted for my consideration. There is nothing to show that Kerman had anything to do with the New York negotiations. Nor, it should be added, is Di Biase reporting to Kerman the results of the negotiations when he met at the offices in London sufficient to place Kerman in the role of an active participant.

Plaintiffs see in Kerman's relations with PPL a basis for jurisdiction. Here Kerman had at least "minimal contacts" with New York. Although he did not attend any of the board meetings which were held here quarterly and had not been in New York since 1966, he signed an S–1 form and amendment which were filed with the SEC; he was a member of the PPI board during the negotiations and owns 500 shares of PPI stock. PPI, however, was explicitly not affected by the merger agreement according to a joint announcement by the plaintiffs and defendants. Some cases hold that in order for *in personam* jurisdiction to be asserted the cause of action must arise out of or be connected with business or activity in the state, *see, e. g., Rivera* v. *Pocahontas Steamship Co.,* 340 F.Supp. 1307, 1310, 1311 (D.Mass. 1971). While other cases state that doing business is sufficient contact in and of itself to enable personal jurisdiction to be exercised in respect of even an act unrelated to the business, *see, e. g., Taisho Fire & Marine* v. *The Vessel Montana,* 335 F.Supp. 1238, 1241 (N.D. Cal.1971), this conclusion is usually undergirded by recitations of substantial contacts with the forum state. Moreover, in such cases a tort is usually involved and the defendant's contacts with the forum state are of far greater substance than Kerman's mere membership on the PPI board and placing his signature on forms filed with the SEC.

The rule in *Hanson* v. *Denkla,* 357 U. S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958) is that there must be some act by which the absent defendant purposefully availed himself of the privilege of conducting activities within the forum state. This requirement of "minimum contacts" is a flexible standard, *Blount* v. *Peerless Chemicals (P.R.) Inc.,* 316 F. 2d 695 (2d Cir. 1963); *Turner* v. *Baxley,* 354 F.Supp. 963 (D.Vt.1972). Under the circumstances of this case, Ker-

man as an alleged co-conspirator must be found to have done some purposeful act in New York affecting the alleged conspiracy or some purposeful act outside New York which he knew, or had reason to know, would help bring about the June 17 agreement. Nothing he has done in respect of PPI can fit into that category. The burden to establish jurisdiction rests with the party asserting it, see, e. g., Lizotte v. Canadian Johns- Manville Co. Ltd., 387 F.2d 607 (1st Cir. 1967), and plaintiffs have not met that burden as it relates to Kerman's role in the Leasco-Maxwell negotiations.

Two final points should be made. It is plaintiffs' theory that Kerman knew more about the affairs of PPL and Maxwell's operations than he admits to, and indeed than they have been able thus far to establish. Knowing that PPL was not in sound financial health, plaintiffs argue that Kerman had a duty to advise Leasco officials of what he knew. On this record, Kerman was clearly a non-participant in the Leasco-Maxwell dealings; he met with Leasco officials once during the course of the negotiations and his contribution then was concededly limited and again after the agreement had been signed. In his role, therefore, as PPL director, he owed no duty to Leasco "to insure that all material, adverse information is conveyed to them." "A director's liability to prospective purchasers under Rule 10b–5 can be only secondary, such as that of an aider and abettor, a conspirator, or a substantial participant in the fraud perpetrated by others." Lanza v. Drexel & Co., 479 F.2d 1277, 1289 (2d Cir. 1973). While Lanza relates to the merits, it makes clear that failing to state what he allegedly knew to Leasco, Kerman, absent a showing of active participation in the alleged swindle, cannot by such action now bring into play the causative effects on which jurisdiction under Section 27 might rest.

Finally, Kerman's role as a bystander who did not know what was going on in respect of this alleged conspiracy is con-firmed by what he did. He had bought 30,000 PPL shares in 1964 at 14 shillings per share, and by January, 1969, through splits and dividends, his original purchase had accrued to 58,000 PPL shares. He held on to those shares until 1971 and 1972 when he sold them to his sons at 4 shillings per share. It is inconceivable that had Kerman been conspiring with Maxwell, as alleged, he would not have sold his shares in June-July, 1969 at a handsome profit, which plaintiffs estimated could have been as much as $264,000. Instead he kept these shares and his wife kept 11,000 PPL shares until such time as, according to plaintiffs, they became virtually worthless. There is clearly no basis on which this court can exercise jurisdiction over Kerman. Accordingly, the motion to dismiss is granted and, pursuant to Rule 54(b), Fed.R.Civ.P., the order and judgment in respect thereto shall be made final. My order of December 21, 1973 is vacated, and Maxwell is ordered to appear within 10 days from entry of this order for his continuing deposition until completed.

So ordered.