**GROVE PRESS, INC. et al., Plaintiffs,**

v.

**CENTRAL INTELLIGENCE AGENCY et al., Defendants.**

**No. 76 Civ. 5509 (VLB).**

United States District Court,
S. D. New York.

Jan. 15, 1980.

Frankfort, Garbus, Klein & Selz, New York City by Arthur J. Ginsburg, New York City, for plaintiffs.

Robert B. Fiske, Jr., U. S. Atty., Southern District of New York, New York City by William G. Ballaine, Asst. U. S. Atty., New York City, for defendants.

Carter, Ledyard & Milburn, New York City, for William F. Raborn, Jr. and Thomas H. Karamessines.

Cadwalader, Wickersham & Taft, New York City, for defendants Colby and Schlesinger.

Michael I. Saltzman, New York City, for James J. Angleton and Raymond Rocca.

Mortimer Todel, New York City, for Richard Ober and Newton Scott Miler.

## MEMORANDUM ORDER

VINCENT L. BRODERICK, District Judge.

*Facts*

Plaintiffs Grove Press, Inc. ("Grove Press"), a New York publishing company, its president and principal stockholder, and one of its editors, brought this action against the CIA and various former employees of the CIA.

The complaint alleges that certain counterintelligence activities that the defendants conducted from 1955 to 1976 violated constitutional rights of plaintiffs and violated federal statutes governing CIA activities. These activities include a mail intercept program carried on in New York from 1955 to 1973 with the plaintiff company as one of its many targets, and "Operation Chaos" and "Project 2", information gathering schemes pursuant to which a file was opened on the plaintiffs and various forms of harassment were practiced against them. The complaint seeks, *inter alia*, money damages against the individual defendants.

1. The defendants have also moved to quash service against them. With the exception of defendant Miler, however, none of the defendants contends that service of process was not effected on him in any manner. The sole basis for these defendants' motions appears to be that they were served outside New York. Since I find that personal jurisdiction is properly asserted over them under the New York long-arm statute, which provides for extraterritorial service, this is not sufficient grounds for quashing service.

Defendant Miler contends that he was not served in any manner with the summons and complaint in this action. The summons and complaint were affixed to the door of his former residence in Alexandria, Virginia, and a copy was mailed to him at that address. CPLR

Previously, the individual defendants moved before this court to dismiss the case against them for lack of personal jurisdiction. The plaintiffs responded, predicating jurisdiction alternatively on 28 U.S.C. § 1391(e) and N.Y. CPLR § 302(a), a New York long arm statute. I denied the defendants' motion, finding jurisdiction under § 1391(e). Accordingly, I found no need to address jurisdiction under the New York long arm statute. I certified the question of § 1391(e) jurisdiction to the Court of Appeals. That court reversed on September 10, 1979, holding § 1391(e) inapplicable to damage suits against government officials sued as individuals. The case is now before me on remand to determine whether jurisdiction exists under the New York long arm statute.[1]

For the reasons which follow, I hold that the court does have jurisdiction as to all the defendants with the exception of Raborn, Schlesinger and Ober. The motion to dismiss is granted as to Raborn, Schlesinger and Ober and denied as to the remaining defendants—without prejudice to renewal after discovery has been conducted.[2]

*Discussion*

Plaintiffs have urged that jurisdiction may be predicated on any of the three grounds enumerated in CPLR § 302(a). I find that jurisdiction exists under § 302(a)(2) and accordingly do not address the other potential grounds.

Section 302(a)(2) provides:

§ 308(4) requires that the papers be affixed to the door of "either the *actual* place of business, dwelling place or usual abode" of the defendant. Defendant Miler had not resided in Alexandria for six months prior to this attempted service. Accordingly, service on defendant Miler is quashed with leave to effect proper service within 90 days of this decision.

2. The affidavits submitted by the plaintiffs in opposition to the motion are not based on facts within the personal knowledge of the affiant, but are rather based on facts gleaned from public reports. On a post-discovery motion the plaintiff would have to demonstrate that he has sufficient evidence admissible at trial to establish threshold jurisdiction.

(a) Acts which are the basis of jurisdiction. As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nondomiciliary, or his executor or administrator, who in person or through an agent: . . .

2. commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act;

The defendants do not contest the proposition that the alleged acts, if proven, would constitute "tortious acts" within the state. Instead, they attack this basis of jurisdiction on two fronts. They contend (1) that any tortious acts were committed by them in their capacities as CIA officials and cannot form the predicate for jurisdiction over them in their individual capacities, and (2) that the in-state acts complained of were not committed by them personally, but by other CIA employees who were acting as agents of the CIA and not as agents of the individual defendants. The answer to both of these contentions really depends on the resolution of a single issue: In what capacity were the tortious acts performed for jurisdictional purposes?

■ A number of decisions address this issue as it arises in the corporate context. In that context the following rule has emerged: The acts of a corporate officer or employee taken in his corporate capacity within the jurisdiction generally cannot form the predicate for jurisdiction over him in his individual capacity.

That rule has been applied to tortious acts of corporate officers, CPLR § 302(a)(2), e. g. *Lehigh Valley Industries, Inc. v. Birenbaum*, 527 F.2d 87 (2d Cir. 1975); *Schenin v. Micro Copper Corp.*, 272 F.Supp. 523 (S.D. N.Y.1967), as well as to acts which would constitute "transacting business" within the meaning of CPLR § 302(a)(1), e. g. *U. S. v. Montreal Trust Co.*, 358 F.2d 239 (2d Cir.), cert. denied, 384 U.S. 919, 86 S.Ct. 1366, 16

L.Ed.2d 440 (1966); *Louis Marx & Co. v. Fuji Seiko Co., Ltd.*, 453 F.Supp. 385 (S.D. N.Y.1978). While at least one district court has reasoned persuasively that it is far less fair to permit the corporate officer who enters the jurisdiction to commit a tort to hide behind the "fiduciary shield" than it is so to permit the corporate officer who enters the jurisdiction to "transact business" legitimately, *Merkel Associates, Inc. v. Bellofram Corp.*, 437 F.Supp. 612 (W.D.N.Y. 1977), that distinction does not appear to be the law in New York or in this circuit.

■ If the corporate officer commits a tort in furtherance of the corporation's business, only the corporation will be subject to jurisdiction. *Unicon Management Corp. v. Koppers Co.*, 250 F.Supp. 850 (S.D. N.Y.1966). Torts committed in his own rather than the corporation's best interests, however, will subject him to jurisdiction even if he purported to be acting for the corporation, e.g. *U. S. v. Montreal Trust Co., supra*, 358 F.2d at 243 (defendant could not have been acting as agent for the corporation of which he was general manager while he was actively diverting funds from the corporation to his friends and relatives).

■ While the rules developed in a corporate context have been applied to government officers, e. g. *Marsh v. Kitchen*, 480 F.2d 1270 (2d Cir. 1973), they cannot be transferred without some thought to their underlying rationale. In the corporate context the illegality or tortious nature of an employee's act may accrue to the benefit of the corporation—at least so long as the tort does not become the subject of litigation. The business of a corporation is to make money and its profits will often be enhanced by tortious conduct. The rule articulated in cases like *Unicon, supra*, reflects a policy that it is unfair to subject an individual to jurisdiction on account of an act from which his employer derived the primary benefit.[3]

---

**3.** It is interesting to note, however, that a corporate officer remains liable for his own torts when even they are committed in his capacity as corporate officer, e. g. *Fleck v. Perla*, 40

A.D.2d 1069, 339 N.Y.S.2d 246 (4th Dep't 1972), 339 N.Y.S.2d 246; *Bailey v. Bakers Air Force Gas Corp.*, 50 A.D.2d 129, 376 N.Y.S.2d 212 (3d Dep't 1975). Thus the procedural law

The same policy is not nearly so persuasive in a government context. A government agency is created by statute to exercise enumerated powers. Its aim is not to make a profit but to exercise those powers, consistent with law, for the benefit of the public. The government officer who engages in illegal conduct may never be said to be acting for the "benefit" of a government agency since its only "benefits" are defined and circumscribed by the laws which are being breached.

The CIA was established and its powers enumerated in the National Security Act, 50 U.S.C. § 403. Section 403 also places express limitations on these powers by providing that: "the Agency shall have no police, subpena, law-enforcement powers, or *internal-security functions*," 50 U.S.C. § 403(d)(3) (emphasis supplied). The plaintiffs have alleged that those prohibitions were contravened by the intelligence activities directed at them and that the defendants were aware of their illegality at the time they directed or condoned the activities. Those allegations are amply supported by the affidavits submitted by the plaintiffs; indeed, as a result of a 1975 report by the Commission on CIA Activities Within the United States, they are now a matter of public record.[4]

■ On the basis of these allegations, I find that the plaintiffs have made out a prima facie case that certain of the defendants committed acts for which they may be subjected to jurisdiction as individuals. Concededly, there is nothing to suggest that those defendants expected to benefit as individuals from their allegedly illegal activities. Yet neither can they be said to have acted on behalf of the United States when they knowingly exercised powers explicitly denied them by the United State Congress.

■ The record suggests that the defendants acted in what they conceived to be the best interests of the United States, notwithstanding the limited scope of their mandate. The traditional distinction between "personal" and "corporate" acts is an inadequate one for dealing with such motivations. Accordingly, I am guided by the general principles of "fairness" which have ultimately informed all of the case law in this area. I find that an action taken by a government agent in knowing contravention of a statutory mandate for the benefit of his administration or the aggrandizement of his agency is no less the product of an individual decision for which it is fair to subject him to jurisdiction than such an action would be if taken solely for personal gain.

■ Similar reasoning counsels against accepting the defendants' second argument: that actions taken by CIA agents in New York may not be attributed to the defendants in Washington, but only to their common employer, the CIA. The New York CIA agents could not have been acting on behalf of the United States government if they were acting on the instruction of Washington officials who knowingly exceeded their authority.

■ To establish that the New York CIA employees were the "agents" of these defendants for jurisdictional purposes, the plaintiffs need not establish the existence of a formal agency, *Galgay v. Bulletin Co.*, 504 F.2d 1062 (2d Cir. 1974), but may instead rely on the existence of a conspiracy carried out in part by co-conspirators in New York. *Socialist Workers Party v. Attorney General of U. S.*, 375 F.Supp. 318, 321 (S.D.N.Y.1974). The plaintiffs must, however, "come forward with some definite evidentiary facts to connect the defendant with transactions occurring in New York." *Id.* at 322.

■ As to the defendants Angleton, Colby, Karamessines, Rocca, and Miler, the plaintiffs have prima facie established such a connection. They have alleged in their affidavit that Angleton, as Chief of Counterintelligence, sought approval for and di-

does not parallel the substantive law of torts in this respect.

**4.** While plaintiffs have not established specific knowledge by each defendant, they have established that the illegality of the projects was common knowledge within the agency. Certainly these defendants, all high-ranking officials, can be charged with knowledge of the scope of the charter under which they were operating.

rected the mail intercept project. They have alleged that Karamessines was Assistant Deputy Director of Planning from 1965–1969 and Director in 1969, and that the Directorate conducted all counterintelligence activities; that Karamessines was a member of a 1965 committee which considered suspending the mail intercept program and ultimately decided against it; and that he approved annual renewals of Project 2. They have alleged that Colby reviewed and approved Project 2 in the fall of 1973.[5] They have alleged that Rocca was a member of the counterintelligence staff which proposed expansion of the mail intercept project and directed its operation, and that he was in charge of the intercept project and was present in 1971 at a high-level CIA conference to discuss the continuation of the project. They have alleged that Miler was a member of the counterintelligence staff and supervised a special operations group responsible for operation Chaos throughout most of the period of its operation. These allegations give rise to a reasonable inference that these defendants were aware of the counterintelligence projects and were involved either in their operation or in the decision to continue them. Accordingly, I find that plaintiffs have prima facie established that the New York CIA personnel acted as the agents of these defendants in carrying out these projects.

A recent decision in this district supports that conclusion. In *Clark v. U. S.*, D.C., 481 F.Supp. 1086, 78 Civ. 2244 (filed Nov. 20, 1979), Judge Lowe found that the plaintiffs had established threshold jurisdiction over L. Patrick Gray, former acting director of the FBI, by adducing evidence that he directed and authorized a program of illegal surveillance against them. Gray, like these defendants, never entered New York to commit these activities. Like these defend-

ants he was simply the mastermind behind an operation whose execution he left entirely to others. The language of the long-arm statute reflects a policy that such defendants will not be permitted to shield themselves from jurisdiction by acting through subordinates.

*Marsh v. Kitchen*, 480 F.2d 1270 (2d Cir. 1978), relied on by the defendants, is distinguishable. In *Marsh*, the plaintiff sued in the Southern District of New York a Secret Service agent and an Assistant United States Attorney residing in Missouri for violations of his constitutional rights arising out of a mistaken arrest which occurred in New York. The plaintiff sought to assert jurisdiction over the Missouri defendants on the grounds that the New York Secret Service agents who effected the arrest in New York were acting pursuant to notification of plaintiff's whereabouts sent to them by the Missouri defendants. The Court of Appeals rejected that contention on two grounds: 1) that the New York agents were acting not for the benefit of the Missouri defendants but for the benefit of the United States government, and 2) that they were not acting at the direction or under the control of the Missouri defendants; the notice sent to them concerning the plaintiff was not mandatory but merely informative.

In *Marsh*, the defendants did not act in knowing contravention of the law; the entire incident was a mistake. The Missouri defendants had every reason to believe that they were acting "on behalf of the United States." Consequently, it would indeed have been unfair to subject them to jurisdiction for the New York act which they "encouraged" without a thought for the risk that they might one day be forced to appear in a New York court. The plaintiff in this case has made out a prima facie case that these defendants were aware of the illegality of their acts, of its effects in New

---

5. Plaintiffs have also asserted that Colby was a member of the Directorate of Plans while the mail intercept program was going on. Colby has, however, submitted unrefuted affidavits which establish that he was stationed abroad during most of the relevant period and was not even aware of the mail intercept project.

The plaintiffs have not established a date as of which they ceased to be the targets of

Project 2. In view of Colby's late entry onto the domestic scene, plaintiffs may have some difficulty in establishing that they were still targets of Project 2 at the time Colby became involved. It would be inappropriate, however, to dismiss Colby on this basis until discovery has been conducted.

York, and of the risks of public disclosure. Unlike the defendants in *Marsh*, they allegedly directed and controlled the New York activities. The equities which informed the decision in *Marsh* do not dictate the same result in this case.

█ As to the defendants Raborn, Schlesinger, and Ober, however, no specific showing has been made connecting them to the New York activities.[6] While the complaint alleges that all the defendants "authorized, acquiesced in, agreed to, allowed, ratified and/or undertook" the alleged acts, such unsupported assertions are an insufficient predicate for jurisdiction. *Socialist Workers Party v. Attorney General of U. S.*, 375 F.Supp. at 322 (Griesa, J.).

SO ORDERED.

---

**6.** With respect to defendant Raborn, plaintiffs allege only that he was Director of the Agency in 1965–66. They have adduced no evidence tying him directly either to Chaos or to the mail intercept program. He has asserted in his affidavit that he was connected with the agency only during that year and has denied any knowledge of the mail intercept program. Schlesinger's only connection with the lawsuit is his meeting in 1973 to discuss the Postmaster General's ultimatum that the mail intercept project to be terminated. Since that meeting resulted in a decision to terminate the project, Schlesinger's involvement in no way contributed to the plaintiff's injury. Defendant Ober is alleged to have been a member of the counterintelligence staff which directed a number of counterintelligence projects. There are no assertions, however, which would tend to establish that he was involved in the operation of the particular projects complained of.