Mitchell DIXON, Plaintiff,

v.

Mitchell MACK, Gifford R. Cappellini, Joseph Alexander, Jr., Gary Scharff, William Rick, Douglas "Doe", Michael "Moe", and Tim "Toe", Defendants.

No. 80 CIV 3040 (LBS).

United States District Court,
S. D. New York.

Dec. 10, 1980.

Levy, Gutman, Goldberg & Kaplan, Eugene N. Harley, Jeremiah S. Gutman, New York City, for plaintiff.

Alan G. Apfel, Great Neck, N. Y., for defendants William Rick and Gifford R. Cappellini.

OPINION

SAND, District Judge.

This case presents the question of whether an out-of-state defendant subjects himself to jurisdiction under the New York long-arm statute by virtue of the activities of his co-conspirators in New York, when he did not join the conspiracy until after its activities in New York had been completed.

Plaintiff Mitchell Dixon has sued a number of defendants, including William Rick, under 42 U.S.C. §§ 1983 and 1985, alleging a conspiracy to deprive Dixon of his civil rights and seeking damages and injunctive relief. The matter comes before this Court at present on a motion by defendant Rick to quash service as to him on the ground that the Court lacks personal jurisdiction over him.

For the reasons stated below, we deny Rick's motion, subject to renewal at trial should the facts as they then appear so warrant.

The facts in this case, as alleged in the complaint, are as follows. Plaintiff at some point in the past became an adherent of the Unification Church. Subsequently, an order was procured *ex parte* in Arkansas, naming plaintiff's mother as his conservator. Plaintiff asserts that the order was invalid, claiming the issuing court lacked jurisdiction and that the order was procured "through fraud and deceit." Plaintiff's "Verified Complaint" at 8. The events of which plaintiff complains in the present action are alleged to have begun when defendants Cappellini, Alexander, "Doe", "Toe", and "Moe" met with plaintiff's mother on a day in May of 1978 and allegedly formed a conspiracy to deprive plaintiff of his civil rights. Plaintiff alleges that on or about that day defendants "Doe", "Toe", and Cappellini, together with plaintiff's mother, forcibly abducted him in New York City and drove him to New Jersey. There they were joined by defendants Alexander, "Moe", and Scharff. Plaintiff alleges that the defendants "attempted to 'deprogram'" him. Plaintiff's "Verified Complaint" at 7. After three days they were joined by defendant Mack and plaintiff's aunt, and plaintiff was removed to Pennsylvania. After what was apparently four more days, defendant Rick, who is a psychiatrist, was called in. Plaintiff's

"Verified Complaint" at p. 5, recites that, "Defendant ... Rick ... is a psychiatrist licensed in the State of Pennsylvania. Defendant Rick participated in and agreed to commit the wrongful acts hereinafter described." Plaintiff's assertions regarding Rick continue:

> Defendant Cappellini thereafter [once plaintiff had been removed to Pennsylvania] brought in Defendant Rick to speak with plaintiff. Rick asked plaintiff a few questions concerning Plaintiff's relationship with his mother. Upon information and belief, Defendant Rick thereafter, and with no further examination of Plaintiff, wrote a report in which he asserted that, in Rick's professional opinion as a psychiatrist, Plaintiff was "unbalanced."

Plaintiff's "Verified Complaint" at 10.[1] One week after plaintiff was moved from New Jersey to Pennsylvania, he escaped and returned to New York.

Plaintiff's allegations are that Rick joined the conspiracy when he was called in to see plaintiff Dixon in Pennsylvania. "Affidavit" of Eugene N. Harley at 2–3. The same affidavit recites further specifics of Rick's involvement. See Appendix *infra.* Plaintiff states that, "[t]he exact extent of [Rick's] participation and his liability ... are questions of fact to be determined at trial." *Id.* at 6.

Plaintiff thus maintains that Rick joined a conspiracy in progress and that although he himself performed no acts in furtherance of the conspiracy in New York, and did not join the conspiracy until after the conspirators' acts in New York were completed, he is responsible for the acts of his co-conspirators in New York and therefore is subject to this Court's jurisdiction under N.Y.Civ. Prac.Law § 302(a)1. or 2. (McKinney 1972 & Supp.1979). Plaintiff states that, "Defendant Rick joined the conspiracy in progress knowing that overt acts in furtherance of the conspiracy had already occurred in the State of New York." "Plaintiff's Memorandum of Law in Opposition to Motion of Defendant William Rick to Dismiss the Complaint at 1 [hereinafter "Plaintiff's 'Memorandum in Opposition' "]. Plaintiff also states that, "Defendants and the conspirators have threatened and continue to threaten to assault and imprison Plaintiff unless he renounces his religious beliefs and associational preferences." Plaintiff's "Verified Complaint" at 4.

Defendant Rick does not contest that he was called in by Cappellini to see Dixon and did so. However, Rick denies that he was party to the conspiracy. "Reply Affidavit" of Alan G. Apfel at 2. Rick maintains that he did not know and had not communicated with any of his co-defendants before Cappellini's phone call. "Affidavit" of William Rick at 3. He also denies that before he was approached in Pennsylvania he "had any knowledge ... of any actions that had taken place prior to" the day he got the call. "Memorandum of Law in Support of Motion by Defendant, William Rick, to Quash Service of the Summons and Complaint" at 9 [hereinafter "Defendant's 'Memorandum in Support' "]. Moreover, "[t]he defendant, RICK, ... denies committing any tortious act through this agency in New York." *Id.* at 10. Defendant Rick further states in his "Affidavit" at p. 2:

> I am a resident of the State of Pennsylvania ... and am a duly licensed psychiatrist in that state. I do not own, use or

---

1. Rick asserts:

   That at approximately 9 o'clock on the night of June 1, 1978, I received a telephone call from the defendant, GIFFORD CAPPELLINI, who asked if I would come to his home to speak with the plaintiff who it was believed was acting in an irrational manner....

   That on June 1st, 1978, I did go to the home of the co-defendant, GIFFORD CAPPELLINI, and did spend a short period of time speaking with the plaintiff and his mother and left the Cappellini residence at approximately 3 a. m. in the morning of June 2nd.

   That the foregoing, which is basically what is alleged in the complaint, was my sole contact with the plaintiff, his mother or any of the co-defendants concerning the instant matter. I further state to the Court that I wrote no report as alleged in the complaint and have no idea what led the plaintiff to make that allegation.

   "Affidavit" of William Rick at 3–4.

possess any real estate within the State of New York. My practice is limited to Pennsylvania and I obtain no revenue from outside the State of Pennsylvania, and I do not solicit business from or in New York and I further do not derive revenue from goods or services sold in New York.

Whether this Court has jurisdiction over Rick is determined first by New York law, since Fed.R.Civ.P. 4(e) makes state law determinative in cases in which the relevant federal statute does not prescribe the circumstances of proper service.[2] Only if this Court has jurisdiction under New York law do we proceed to consider whether such jurisdiction is constitutional.

The controlling statute is N.Y.Civ. Prac.Law § 302.[3] Plaintiff argues that this Court has jurisdiction over Rick primarily under § 302(a)2., but also argues under § 302(a)1. "Plaintiff's Memorandum of Law in Opposition" at 7–10.

The only act of which plaintiff complains which took place in New York is plaintiff's alleged abduction in May of 1978. Therefore, if we are to hold that this Court has jurisdiction over Rick, such jurisdiction must derive from that event. In order to find that we have jurisdiction, we must conclude as a matter of state law that Rick "in person or through an agent: 1. transacts any business within the state . . . ; or 2. commits a tortious act within the state. . . ." § 302(a). As we find that we have jurisdiction under § 302(a)2., we do not reach § 302(a)1.

■ We recognize at the outset that plaintiff has the burden of establishing the Court's jurisdiction over Rick. *See Lehigh Valley Industries, Inc. v. Birenbaum,* 527 F.2d 87, 92 (2d Cir. 1975). At the same time, on a motion to dismiss the Court will construe the pleadings and affidavits in the light most favorable to the nonmoving party. *See Equipment Spare Parts, Ltd. v. World Wide Machinery Corp.,* No. 79 Civ. 5811 (S.D.N.Y. Aug. 1, 1980) (Motley, J.).

■ It has been recognized that "under certain circumstances a person may be subjected to jurisdiction under CPLR § 302(a)(2) on the theory that his co-conspirator is carrying out activities in New York pursuant to the conspiracy." *Socialist Workers Party v. Attorney General of the United States,* 375 F.Supp. 318, 321 (S.D.N.Y.1974). To establish jurisdiction on this basis, plaintiff must make a prima facie factual showing of conspiracy. *Merkel Associates, Inc. v. Bellofram Corp.,* 437 F.Supp. 612, 617 (W.D.N.Y.1977). *See also United States v. Montreal Trust Co.,* 358 F.2d 239, 242 & n.4 (2d Cir. 1966), *cert. denied,* 384 U.S. 919, 86 S.Ct. 1366, 16 L.Ed.2d 440 (1966). He must also allege specific facts warranting the inference that the defendant was a member of the conspiracy. *Louis Marx & Co. v. Fuji Seiko Co.,* 453 F.Supp. 385, 391–92 (S.D.N.Y.1978). "The plaintiff must come forward with some definite evidentiary facts to connect the defendant with transactions occurring in New York." *Socialist Workers Party,* 375 F.Supp. at 322.

■ We find that plaintiff has made the necessary prima facie factual showing that Rick was a member of a conspiracy in this case. Plaintiff's "Affidavit" of Eugene N. Harley, *see* Appendix *infra,* gives rise to a reasonable inference that Rick knew that he was participating in an effort to "deprogram" Dixon. Moreover, Harley's "Affidavit", at p. 4, presents Rick as having said in his deposition, referring to the night Rick saw Dixon, that "I indicated that perhaps

---

**2.** None of the statutes under which plaintiff sues so prescribe.

**3.** The text of this provision, in relevant part, reads as follows:
§ 302. Personal jurisdiction by acts of non-domiciliaries
  (a) Acts which are the basis of jurisdiction. As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, . . . who in person or through an agent:
    1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or
    2. commits a tortious act within the state . . . .

he [*i. e.*, defendant Alexander] and I could work together and we would combine medical and lay deprogramming together, and that was agreed to as a reasonable idea." *See also Grove Press, Inc. v. Central Intelligence Agency*, 483 F.Supp. 132, 137 (S.D.N.Y.1980).

Furthermore, "plaintiff . . . [has] come forward with some definite evidentiary facts to connect the defendant with transactions occurring in New York." *See Socialist Workers Party*, 375 F.Supp. at 322. Unlike the *Socialist Workers Party* case, in which the plaintiff failed to come forward with any indication that the moving defendants' activities had any connection with the plaintiff, such a connection is alleged here. Plaintiff here, by making a prima facie showing that Rick joined a conspiracy whose members' activities in furtherance of the conspiracy included a critical overt act in New York, has connected the moving defendant with acts occurring in New York. Moreover, as noted earlier, plaintiff alleges that "Defendant Rick joined the conspiracy in progress knowing that overt acts in furtherance of the conspiracy had already occurred in the State of New York." "Plaintiff's Memorandum of Law in Opposition" at 1. Nowhere in Rick's papers does he controvert this allegation, limiting his denials to knowledge of such acts prior to the time he was first approached by the alleged co-conspirators. *See* pp. 347–348 *supra*. For the purposes of this motion, we will accept plaintiff's allegation as true. This strengthens the connection between Rick and the activities of the conspiracy in New York. In addition, since the "mere presence of one co-conspirator within the jurisdiction does not create jurisdiction over all alleged co-conspirators," *see Lehigh*, 527 F.2d at 94 n.6, we note that the plaintiff has made the necessary showing of more than "mere presence" in New York. Plaintiff's allegations, if true, establish that an overt act not only in furtherance of the conspiracy, but critical to it, occurred in New York, namely Dixon's alleged abduction.

In his papers, Rick argues that in order for this Court to have jurisdiction over him, more is required than activities of co-conspirators in New York in furtherance of the conspiracy. He quotes that portion of the district court's first opinion in *Leasco Data Processing Equipment Corp. v. Maxwell*, 319 F.Supp. 1256, 1262 (S.D.N.Y.1970) (Lasker, J.), *vacated*, 468 F.2d 1326 (2d Cir. 1972), *on remand* 68 F.R.D. 178 (S.D.N.Y. 1974) (Carter J.), which states that "to establish an agency relationship under the New York long-arm statute . . . there must be specific facts that show that the principal had requested the agent to perform purposeful acts in New York for the principal's benefit" (citation omitted). "Reply Affidavit" of Alan G. Apfel at 3. He also quotes from the court's opinion in *Faim Information Services, Inc. v. Borchert*, 395 F.Supp. 878, 880 (S.D.N.Y.1975): "the rule in New York is that an out-of-state principal must exercise 'domination and control' over the in-state agent in order for the principal to be subject to the jurisdiction of New York courts" (citations omitted). Rick asserts, "[i]t follows from the fact pattern of this case that no out-of-state principal, i. e., RICK, exercised any control over any agent in New York since RICK was not a member of the conspiracy during the time when the acts took place within New York." Defendant's "Supplemental Memorandum in Support" at 6. Elsewhere, he states that,

While it is true that co-conspirators are held to have an agency relationship under the New York law and that the relationship need not be the traditional agency relationship, there must be a showing for jurisdictional purposes that the agent acted in New York for the benefit and with the knowledge and consent of the nonresident.

Defendant's "Memorandum in Support" at 9 (citations omitted).

The Second Circuit has repudiated the requirement of a formal agency relationship as a basis for imputing acts to a co-conspirator for jurisdictional purposes. *See Lehigh*, 527 F.2d at 90 n.3 *citing Galgay v. Bulletin Co.*, 504 F.2d 1062, 1065 (2d Cir. 1974); *Clark v. United States*, 481 F.Supp.

1086, 1100 (S.D.N.Y.1979), *appeal dismissed,* 624 F.2d 3 (2d Cir. 1980). However, where the courts have been asked to exercise jurisdiction under § 302(a)2. on the basis of the acts of co-conspirators in New York, they have continued to impose requirements related to agency concepts. Thus, the courts have required that the defendant have an awareness of the effects in New York of its activity, *see Grove Press,* 483 F.Supp. at 137–38; *Equipment Spare Parts,* No. 79 Civ. 5811, that the activity of the co-conspirators in New York be to the benefit of the out-of-state conspirators, *see Clark,* 481 F.Supp. at 1101; and that the co-conspirators acting in New York be "acting at the direction or under the control of the . . . [out of state] defendants," *Grove Press,* 483 F.Supp. at 137–38, or, as another court has put it, "at the request of or on behalf of" the out-of-state defendant, *Equipment Spare Parts,* No. 79 Civ. 5811. *But see Ghazoul v. International Management Services, Inc.,* 398 F.Supp. 307, 312–14 (S.D.N.Y. 1975) (sustaining jurisdiction without mention of a control requirement, although apparently the defendant's challenge to the court's jurisdiction was based not on the absence of control but rather on "the fact that it [had] never been in New York (either by officer or agent) and that it fulfilled its role in the subject transaction by means of the mails and by telephone").[4]

We find these requirements satisfied in the present case. First, the requirement that the defendant have an awareness of the effects in New York of its activity is satisfied.[5] Plaintiff has alleged that Rick had knowledge that overt acts in furtherance of the conspiracy had occurred in New York. Rick's joining of the conspiracy, adoption of its goal, and action in furtherance of it, thus constituted a ratification of those acts already committed with the purpose of accomplishing the shared goal. Rick's knowing ratification of acts committed in New York constitutes an awareness of the ramifications or effects in New York of his own activity as a co-conspirator. Additionally, we note that it is black letter

---

**4.** In addition, *Grove Press,* 483 F.Supp. at 137, suggests that plaintiff must "[make] out a prima facie case that . . . [the defendant was] aware of the illegality of [his] acts." This requirement too is satisfied in this case, since plaintiff has made out a prima facie case that Rick joined the conspiracy to "deprogram" Dixon, knew of the acts in New York, *i. e.,* the abduction, and, we infer, knew that Dixon was being subjected to deprogramming efforts against his will, *see* pp. 351–352 *infra.*

**5.** We note also that the requirements articulated by the courts in *Leasco* are satisfied here. The Court of Appeals, in ruling on plaintiffs' assertion of personal jurisdiction under § 27 of the Securities Exchange Act, which the court found afforded jurisdiction to the full extent permitted by the Constitution, stated,

At minimum the conduct must meet the tests laid down in § 18 of the Restatement (Second) of Foreign Relations Law, including the important requirement that the effect "occurs as a direct and foreseeable result of the conduct outside the territory." We believe, moreover, that attaining the rather low floor of foreseeability necessary to support a finding of tort liability is not enough to support *in personam* jurisdiction. The person sought to be charged must know, or have good reason to know, that his conduct will have effects in the state seeking to assert jurisdiction over him.

468 F.2d at 1341 (footnote omitted). On remand, the district court interpreted and applied this standard:

While it is clear that Kerman was never in New York during the course of these negotiations, he could be held to have brought himself within the personal jurisdiction of this court if he committed in England any acts which he "must know, or have good reason to know . . . will have effects" in New York, and the resultant impact in New York must occur "as a direct and foreseeable result of the conduct outside" this country. *See* 2d Circuit *Leasco* opinion, *supra,* at 1341. What I understand this to mean is that Kerman must be shown to have performed some activity in England which he either knew at the time, or should have known, would directly contribute to the furtherance of the negotiations between Maxwell and Leasco in New York, and that the signing of the agreement in New York on June 17, 1969, was a direct and foreseeable consequence of this conduct. 68 F.R.D. at 182. As concluded within, Dixon has made out a prima facie case that Rick acted in furtherance of the conspiracy with knowledge of overt acts in New York essential to the goals of the conspiracy. Inasmuch as he joined and furthered a conspiracy involving an abduction in New York, we conclude that he satisfied the circuit court's requirement.

conspiracy law that one who joins a conspiracy in progress ratifies all that has come before.

Second, we turn to the requirement that the activity of the co-conspirators in New York be to the benefit of the out-of-state conspirator. In *Clark*, 481 F.Supp. at 1101, the court held that the benefit need not be economic, and that the requisite benefit accrues to the out-of-state conspirator when the acts of his co-conspirators in New York realize the goals of the conspiracy. In *Dixon*, the alleged abduction of the plaintiff by the co-conspirators in New York acted to realize the goals of the conspiracy. Therefore, this jurisdictional requirement also is fulfilled.

Third, and lastly, there is the requirement that the out-of-state conspirator have exercised direction or control over the co-conspirators acting in New York, or that the co-conspirators in New York have acted "at the request of or on behalf of" the out-of-state defendant, *Equipment Spare Parts*, No. 79 Civ. 5811. We find this requirement to be satisfied as well. Since, for jurisdictional purposes, we have found that Rick joined the conspiracy, and since plaintiff alleges that Rick knew overt acts had been committed in New York, then, as we have said above, in joining the conspiracy, Rick ratified its earlier acts including those, of course, in New York. It appears from the pleadings and affidavits as they stand that

Rick joined the conspiracy and acted, knowing full well that what was going on at the time he answered Cappellini's call and met with Dixon was an attempt to "deprogram" Dixon. In fact, according to Harley's "Affidavit", *see* Appendix *infra*, Rick made plans with defendant Alexander that evening to collaborate on further "deprogramming" projects. Nowhere in Rick's papers does he suggest to the Court that he believed that Dixon was undergoing "deprogramming" voluntarily. The only reasonable inference for the Court to draw is that Rick knew plaintiff was being "deprogrammed" against his will. Since Rick, as a conspirator, ratified the acts of his co-conspirators in New York, knew that prior overt acts in furtherance of the conspiracy had taken place in New York, and, we infer, knew that plaintiff was being "deprogrammed" against his will, the necessary abduction of Dixon in New York and by Rick's co-conspirators was an act committed also on Rick's behalf, with his approval and assent.[6] While *Grove Press* could be construed to impose a requirement that the out-of-state defendant have directed and controlled the in-state actors, in the sense of having acted as their superior (which was the case in *Grove Press*), we see no reason for this particular requirement, which would distinguish without cause the case of the conspiracy which features a "mastermind", 483 F.Supp. at 137, from the case of that featuring only peer co-conspirators.[7]

6. This case is distinguishable from the circumstance referred to in *Lehigh*, 527 F.2d at 94 n.6, where the Second Circuit said,

> In antitrust cases it is well established that the mere presence of one co-conspirator within the jurisdiction does not render alleged co-conspirators outside the jurisdiction amenable to process. *Bertha Building Corp. v. National Theatres Corp.*, 248 F.2d 833 (2d Cir. 1957), cert. denied, 356 U.S. 936 [78 S.Ct. 777, 2 L.Ed.2d 811] (1958) [*and cert. denied sub. nom. Gumbiner Theatrical Enterprises, Inc. v. National Theatres Corp.*, 356 U.S. 936 [78 S.Ct. 778, 2 L.Ed.2d 811] (1958)]. Similarly where there is a claim of a conspiracy to violate section 10(b) of the Securities Exchange Act, as Judge Friendly stated in *Leasco Data Processing Equipment Corp. v. Maxwell*, 468 F.2d 1326, 1343 (2d Cir. 1972), "To be sure, the rule in this circuit is that the mere presence of one conspirator ... does

not confer personal jurisdiction over another alleged conspirator."

First, this refers to statutory provisions other than § 302. Second, here we have found more than "mere presence" of a co-conspirator in New York. *See* pp. 349–350 *infra*. Third, here we find not only a conspiracy relationship, but also a satisfaction of the lingering agency related requirements which evidently remain in force.

7. The suggestion in *Grove Press* that jurisdiction over an out-of-state conspirator depends in part on his having "directed and controlled the New York activities," 483 F.Supp. at 138, arises in that part of the opinion in which the court distinguishes *Marsh v. Kitchen*, 480 F.2d 1270 (2d Cir. 1973). In *Marsh*, the court ruled there was no jurisdiction over Missouri defendants. However, *Marsh* relied on the rule that "a traditional agency relationship must exist

In the case at hand, plaintiff alleges directly that Rick had knowledge of acts in New York at the time he joined the conspiracy. Therefore, we need not fall back on a requirement that Rick have "masterminded" those acts in order to find that he knew of and approved of them.

Therefore, we conclude that the New York long-arm statute, § 302(a)2., confers jurisdiction over Rick on this Court.[8] We consequently must proceed to consider whether the exercise of such jurisdiction comports with due process.

■ We find that it does. The act of the conspiracy in allegedly abducting plaintiff in New York, which is one of the acts, of course, complained of in the suit, supplies the necessary minimum contacts. *See International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). By joining the conspiracy with the knowledge that overt acts in furtherance of the conspiracy had taken place in New York, Rick "purposely [availed himself] of the privilege of conducting activities within the forum state," *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958). "[T]he defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980) (citations omitted). It is reasonable, fair and just that Rick defend himself in this forum. *See id.* at 292, 100 S.Ct. at 564, and cases cited therein.[9] This is particularly the case, where to hold otherwise might substantially prejudice plaintiff by posing problems of proof and inviting duplicative

litigation. *See generally, id.; McGee v. International Life Insurance Co.*, 355 U.S. 220, 223, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957).

While we have found that plaintiff has made the necessary prima facie showings for jurisdictional purposes, in the event evidence is adduced at trial which undercuts the bases for this Court's jurisdiction over Rick, Rick may then renew this motion. *See Ghazoul*, 398 F.Supp. at 310 n.1, 314.

SO ORDERED.

## APPENDIX

Harley's Affidavit recites that Rick's deposition has been taken in a case now pending in the Middle District of Pennsylvania. "Affidavit" of Eugene N. Harley at 2. It goes on to recite, at pp. 2–5:

THIRD: The following excerpts from the deposition of Dr. Rick set forth in his own words how he came to join the conspiracy to violate the civil rights of Mitchell Dixon....

(1) Page 17, lines 15–22

A: (Doctor Rick) Attorney Gifford Cappellini called me.

Q: (deponent) In relation to what matter?

A: In relationship to a case which he was dealing with Freedom of Mind and wanted a medical and psychiatric opinion.

Q: What case was that?

A: The case was Mitchell Dixon.

It should be noted that Freedom of Mind, Inc. was a corporation formed by Defendant Cappellini and Joseph Alexander, Tim Lusch and others for the purpose of "de-

---

between the non-domiciliary and the alleged agent." *Id.* at 1273. However, the Second Circuit overturned this rule in *Galgay*, undermining the authority of *Marsh*. Moreover, *Marsh* makes no mention of conspiracy as a possible basis for jurisdiction over an out-of-state defendant. In any event, the case at hand is distinguishable from the situation presented in *Marsh*.

**8.** While plaintiff hinges all of its arguments that this Court has jurisdiction over Rick on Rick's relationship to the alleged abduction in New York, we note that there may be an addi-

tional basis for finding such jurisdiction in plaintiff's allegation that, "Defendants and the conspirators have threatened and continue to threaten to assault and imprison Plaintiff unless he renounces his religious beliefs and associational preferences." Plaintiff's "Verified Complaint" at 11. Again we note that it is black letter conspiracy law that a conspirator, in this case Rick, remains a member of the conspiracy until he affirmatively acts to repudiate it and remove himself.

**9.** Also, *see* note 5, *supra*.

programming" and "rehabilitating" members of unpopular religious groups. . . .

(2) Page 26, lines 17 through 24

THE WITNESS: I think that Tim [Lusch] was at Attorney Cappellini's house that night. I think that he was there and also Joe Alexander was present at the time I went to see Mitchell Dixon because they were concerned about what psychiatric manifestations he might be showing, and that was my original contact with Freedom of Mind.

(3) Page 39, lines 16–18, 25

Page 40, lines 1 through 9

.    .    .    .    .

A:  . . . .  This was still around the time I was just getting into this organization. . . .

Q: When you are talking about just getting in, are you talking about May of 1978 or January of 1979?

A: May of 1978.

Q: Which is the approximate time of the Dixon matter?

A: The Mitchell Dixon matter.

(4) Page 49 lines 3–6, and 20–25

A:  . . . and when Gifford thought the organization needed a medical and psychiatric thing, his mother mentioned my name to him and, therefore, he called me—

Q: Did you have a conversation with Mr. Cappellini?

A: Yes.

Q: What was the substance of that conversation?

A: "Thanks for coming out, I don't know what we would do without you."

(5) Page 53 lines 23–25

Page 54 lines 1–9

Q: Did you have any conversation with Joe Alexander, Jr. that evening?

A: Yes.

Q: What was the substance of the conversation with Joe Alexander, Jr.?

A: I only honestly recall that he wanted to know what my theories were on deprogramming and I indicated that perhaps he and I could work together and we would combine medical and lay deprogramming together, and that was agreed to as a reasonable idea. That's the sum and substance of it.

The night in question is the same night in which Defendant Rick first met Plaintiff Mitchell Dixon.

(6) Page 110 lines 23–25

Page 111 lines 1–16

Q: Did you evaluate the parents in any of these deprogramming or rehabilitation situations?

A: Yes, Mitchell Dixon, for example— going back to number one. I am not sure—I think it was the day after I saw him or shortly thereafter that his mother had come up from wherever it was—North Carolina—South Carolina, and I did see his mother and she was very upset about the situation with her son, and I asked her to come into the office. Well, she asked me to come into the office, and I suggested that would be a good idea because she wanted to find out why he might have possibly been attracted to deviate from her goals and I think I thought it was a wise judgment to have the mother come in so I could see whether or not the idea involved—and again, you have to realize this is the first case I was involved with with Freedom of Mind— that I wanted to be able to talk to the family members as much as possible.