Habibollah Haj Mohammad Hossein KA-SHI and Ashka B.M.M.,
Plaintiffs-Appellants-Cross-Appellees,

v.

Constantine G. GRATSOS, Theodore Graino, Wilbur A. Stile, David A. Friedmann, Gregory J. Roman, Carl Wischmann, Standard Grains (Canada), Ltd., Standard Grains, Inc., Standard Metropolitan Shipping Corporation, Theodore Graino & Co., Inc., and M.V. Eurosky, Defendants-Appellees.

David A. Friedmann,
Defendant-Appellee-Cross-Appellant.

Nos. 8, 37, Dockets 85–7163, 85–7165.

United States Court of Appeals,
Second Circuit.

Argued Sept. 9, 1985.
Decided May 15, 1986.

James P. Schreiber, New York City (Lawrence C. Browne, Louis Epstein, Schwartz Klink & Schreiber, P.C., New York City, of counsel), for plaintiffs-appellants-cross-appellees.

James H. Bell, New York City (Lee D. Unterman, Whitman & Ransom, New York City, of counsel), for defendant-appellee Estate of Constantine G. Gratsos.

Robert H. Kiernan, New York City, for defendants-appellees Theodore Graino, Wilbur A. Stile, Gregory J. Roman, Standard Grains, Inc., and Theodore Graino & Co., Inc.

Michael A. Lacher, New York City (Jill C. Lesser, Iris DeMoyano, Cole & Deitz, New York City, of counsel), for defendant-appellee-cross-appellant David A. Friedmann.

Before KAUFMAN, MESKILL and WINTER, Circuit Judges.

WINTER, Circuit Judge:

Habibollah Haj Mohammad Hossein Kashi and his wholly-owned company Ashka B.M.M. (hereinafter "Kashi") appeal from Judge Sofaer's decision following a non-jury trial. Kashi, the plaintiff in this action, seeks additional damages, extension of liability with respect to one defendant, and enforcement of a settlement agreement. Cross-appellant, defendant David A. Friedmann seeks reversal of that portion of the judgment which holds him liable for Kashi's damages. We reverse with respect to the limitation of defendant Gratsos' liability and the measure of Kashi's contract damages. We affirm the judgment of the district court with respect to the remainder of the issues raised in the appeal and cross-appeal.

## BACKGROUND

This case arises out of Kashi's efforts to purchase grain in the United States and ship it to Iran during the Iranian Hostage Crisis of 1979–80. From the outset, the proposed transactions involved bogus documents in order to circumvent the refusal of American longshoremen to load ships destined for Iran. We state the facts as found by the district court and as supported by the record.

Defendant Standard Grains, Inc. ("SGI") was formed by defendants Wilbur A. Stile, Theodore Graino, and David A. Friedmann to engage in the grain selling business. SGI solicited Kashi's business between 1978 and December, 1979, but Kashi, skeptical of SGI's reliability after hearing that it had once failed to make a promised shipment to Iran, declined to deal with it.

In May, 1979, SGI formed a joint venture with deceased defendant Constantine Gratsos (represented here by his Estate) and his associate, defendant Carl Wischmann. The joint venture, Standard Metropolitan Shipping Corp. ("SMSC"), was to handle SGI's shipping. The organizational structure of SMSC was somewhat uncertain. Some steps were taken to incorporate in Panama, and the entity is referred to as a "corporation"; however, an SGI brochure called SMSC a joint venture. Though no shares of SMSC were issued, the parties agreed that Friedmann and Stile would receive 50% of the SMSC profits, the remaining 50% to be divided between Gratsos and Wischmann as Gratsos directed. Gratsos was SMSC's Chairman, Friedmann its Treasurer, and Stile a Vice-President.

Graino contacted Kashi in the summer of 1979 and informed him of the formation of SMSC and of the participation of the "Onassis people" in the venture. This was a reference to Gratsos, who had close ties to the well-known Onassis shipping organization. Graino told Kashi that he would introduce him to the "Onassis people" the

next time Kashi came to New York. Kashi became interested in dealing with SGI because of this information and came to New York in August or September, 1979. He met with Graino, Gratsos and Wischmann at Gratsos' office in the Olympic Tower on Fifth Avenue. Kashi told Gratsos and Wischmann of his reluctance to deal with Graino and SGI due to their unreliability. Gratsos assured Kashi that Gratsos' participation in the SMSC joint venture ensured its reliability. At this meeting, Kashi was shown an SGI brochure that described its connection to SMSC as follows:

> An impressive advantage in shipping is afforded Standard Grains customers because of its joint venture, STANDARD METROPOLITAN STEAMSHIP [sic] CORPORATION, chaired by Mr. Constantine Gratsos of the Onassis organization, one of the world's most honored and respected names in shipping. This major advantage not only insures the most competitive prices for SG products but also it assures our importers of reliable, on-time deliveries of any commodities ordered from STANDARD GRAINS, INC.

In December, 1979, Kashi met with Stile and Graino who again took him to the Olympic Tower to meet with Gratsos and Wischmann. Gratsos reassured Kashi that any shipments contracted for would be made. Following these personal assurances, Kashi, on December 13, 1979, signed a contract for a shipment of grain ("first shipment"). Kashi opened a letter of credit ("L/C") at a Swiss bank, and at Graino's request, named Standard Grains (Canada) Ltd. ("SGCL") as beneficiary. SGCL was a fictional subsidiary of SGI.

Because of the longshoremen's boycott, irregular documents were used. The shipping contract for the first shipment called for delivery to either Kuwait or Iran, though a second document signed by Kashi and Graino acknowledged that the true destination was Iran. The defendants used false papers in order to draw down the proceeds of the letter of credit and transfer them to the Southern Ohio Bank ("SOB"). Kashi knew that false papers would be used but allowed the letter of credit to be drawn because of Graino's representations to him that the deal was in fact being consummated. ·

The ship carrying the first shipment stopped in Kuwait for a few days, then proceeded to Iran where Kashi's cargo was unloaded in March, 1980. While in Kuwait, the ship incurred expenses of about $60,-000. These were paid by a friend of Kashi's upon SMSC's promise to repay this amount within forty-eight hours. Kashi repaid his friend when SMSC failed to do so.

Kashi met with Graino in London in April, 1980 to resolve unsettled matters from the first shipment and plan a second one. The first shipment had been underweight and Kashi had incurred certain expenses in connection with its delivery in Iran. At this meeting, Graino told Kashi that he had a friend who owned a ship that would make a second shipment directly to Iran. Based on these representations, Kashi on April 26, 1980 signed a contract for the second grain shipment ("second shipment"). Graino said that no additional papers were required for the second shipment since his friend had agreed to ship the grain directly to Iran. Kashi opened a second letter of credit, and Graino again instructed him to designate SGCL as beneficiary. This Kashi did by telex on May 1, 1980. The proceeds were to be payable upon presentation of documentation that a vessel had been loaded, inspected, and was enroute to Iran. The defendants prepared a set of false shipping papers and presented them to the Swiss bank, and on the strength of these papers, 9,943,500 Swiss francs—worth about $6 million at the time—were transferred to defendants' accounts at SOB and First National Bank of Louisville ("FNBL"). The money first went to UCB-Ohio, the parent bank of SOB, apparently because UCB-Ohio had facilities for international monetary exchanges. The Swiss bank sent telexes to SGCL confirming payment of the letter of credit proceeds. Graino telexed Kashi, informing

him of the delivery of the documents to Europe.

None of the defendants, however, had made any attempt to obtain or procure the grain, or to charter a vessel. Although Kashi could hardly complain about the use of false documents, the failure to ship any grain while drawing down on the L/C was clearly a fraud on him.

Within a few days of their receipt in the United States by UCB, the proceeds of the second letter of credit were distributed to various accounts: $3,927,672.37 went to defendants' accounts at UCB-Nassau; $1,227,613.00 went to defendants' accounts at FNBL; $615,402.16 was deposited at Friedmann's direction in defendants' accounts at SOB; and $297,892.42, representing 5% overage, was deposited at Friedmann's instruction in defendants' accounts at UCB and SOB.

The total amount received by Graino, Stile and Friedmann from the second letter of credit was $6,068,579.95. Nevertheless, as the district court found, "All three knew at that time or shortly thereafter that no grain had been acquired, loaded, or shipped and that the $6 million in their possession was obtained by representing to Kashi that grain would be shipped in the amount contracted for, even if not precisely in the manner specified in the L/C."

In the months that followed, Kashi made telephone calls and sent telexes to SGI, primarily to Graino and Stile, requesting information regarding the second shipment. Defendants continued to assert, through telexes from Graino, that Kashi's grain had actually been loaded and was on its way to Iran.

In August, 1980, Kashi made several efforts to ascertain the status of his shipment. Ali Afdahl, a friend of Kashi's, came to New York from London to investigate. After failing to obtain information from Graino, Stile, or anyone else, Afdahl retained New York attorney James Schreiber to investigate. Schreiber learned that no ship had been retained and that no shipment had been made. He flew to London in early September, 1980 to meet with Kashi. Graino and two New York attorneys, Robert Kiernan and Jeffrey Hoffman, also traveled to London to meet with Kashi. Graino, after insisting that Kashi meet him without Schreiber, tried to have Kashi sign a "Modification Agreement," promising to make the shipment shortly thereafter. Afdahl explained to Kashi that the document stated that Kashi had known of and authorized the use of false shipping documents, that he had violated Iranian currency laws, and that his New York counsel had caused unspecified losses that prevented the shipment. Upon learning of its contents, Kashi refused to sign the agreement, stating that it was false. He and Afdahl retained the document despite Graino's attempt to retrieve it.

The next day, Kashi and his lawyer met with Graino and his two lawyers. Kashi again said that the Modification Agreement was false and refused to sign it. Further, he stated that he wanted the grain, not his money. Graino again promised to arrange the shipment.

On September 30-October 1, Friedmann and Kiernan traveled to London. Friedmann, carrying a hidden tape recorder, arrived unannounced at Kashi's apartment. As the district court found:

> Friedmann sought to elicit from Kashi statements critical of the government in Iran, and an admission of Iranian currency violations. He was successful in neither respect. He also sought to convince Kashi to accept a $1.5 million settlement; he claimed that the greater part of the L/C proceeds had been lost because of steps that Kashi's New York counsel had taken which had led to the Longshoremen's Union allegedly learning of the shipment to Iran, which in turn resulted in losses to the Standard Grain companies of $8 million. Friedmann knew that his statements were false: at that time, Friedmann, Graino and Stile still controlled virtually all the L/C proceeds. Kashi refused the proposal.

On October 14, 1980, Kashi's counsel wrote Gratsos to request an urgent meet-

ing concerning the proceeds of the second letter of credit. On October 16, Kashi and his counsel met with Friedmann, Kiernan and Hoffman in the United States. At this meeting, Friedmann promised to return the cash still available—over $5 million—and to make up the balance over a year. When no money was returned, Kashi's counsel sent another letter to Gratsos dated October 22, 1980, stating that legal action appeared necessary to recover the letter of credit proceeds. After Gratsos' receipt of this letter, Friedmann, Graino, and Stile transferred $5.35 million out of the United States. Approximately $350,000 in additional funds was disposed of in various other transfers supervised by Friedmann and others.

Kashi was able to trace $5.3 million of the L/C proceeds to Nassau. Stile and Graino then paid over this money to Kashi's account in London. Kashi also recovered about $176,000 (plus $6,000 in interest) pursuant to an order of the district court issued on September 25, 1981. This latter sum had been in the possession of Friedmann's counsel. However, substantial amounts of the L/C proceeds had not been recovered by the time of trial, and the district court noted that these amounts might still have been in Friedmann's possession.

Shortly after the initiation of this action, all defendants except Wischmann, SMSC, Gratsos and Friedmann entered into a settlement agreement and were dismissed from the case. After a non-jury trial, the district court held that SMSC and Friedmann were liable to Kashi for the balance of the proceeds of the second L/C, approximately $580,000 plus interest. Gratsos was held liable for $47,500, the amount of the proceeds he was found to have converted, but was not found to be a joint tortfeasor with respect to contract damages. The court denied Kashi the benefit of the price increase of the grain over the contract price. After the trial, as part of his proposed judgment, Kashi moved to enforce the settlement agreement, which allegedly had not been performed. The district court denied the motion.

## DISCUSSION

On this appeal, Kashi claims that the district court erred in imposing only limited liability on Gratsos, in limiting him to recover only the contract price, and in failing to enforce the settlement agreement. Friedmann cross-appeals from the finding that he is liable for the full extent of Kashi's losses and assets that the effect of certain "procedural abuses" deprived him of a fair trial in violation of due process.

### 1. *Liability of Gratsos*

The district court limited Gratsos' liability for his role in the scheme to $47,500. In doing so, it stated, "Plaintiffs were unable to prove that Gratsos ... [was] so involved in the fraud and conversion to warrant holding [him] jointly and severally liable as [a] primary [tort-feasor].... He joined with Friedmann, Graino, and Stile in a joint venture, but plaintiffs failed to prove that he intended to use SMSC for fraudulent purposes.... [W]hen he knew or should have known that the L/C proceeds had been drawn down though no shipment had been made, he nevertheless permitted Friedmann to use some L/C funds for his benefit. To the extent he engaged in or permitted these activities, Gratsos converted plaintiffs' assets, and his estate is liable for the amounts involved...."

We believe the conclusion drawn by the district court does not follow from the facts stated. Gratsos was a member of the civil conspiracy proved by Kashi at trial and is liable for the full extent of Kashi's damages. Proof of a civil conspiracy under New York law " 'connect[s] a defendant with the transaction and ... charge[s] him with the acts and declarations of his co-conspirators,' " *Green v. Davies*, 182 N.Y. 499, 504, 75 N.E. 536, 537 (1905) (quoting *Brackett v. Griswold*, 112 N.Y. 454, 466–67, 20 N.E. 376, 379 (1889)), and exposes that defendant to joint and several liability for the victim's losses. *See also Goldstein v. Siegel*, 244 N.Y.S.2d 378, 382, 19 A.D.2d 489, 493 (1st Dept.1963) (defining civil con-

spiracy as "common action for a common purpose by common agreement or understanding among a group, from which common responsibility derives"); *Interstate Cigar Co. v. IBI Security Service, Inc.*, 105 Misc.2d 179, 184–85, 431 N.Y.S.2d 1016, 1020 (Sup.Ct.1980).

Under New York law, a civil conspiracy is

> an agreement or confederation between two or more persons intentionally participating in the furtherance of a preconceived common plan or purpose to defraud. To constitute an actionable conspiracy, plaintiffs must establish not only the corrupt agreement between two or more persons, but their intentional participation in the furtherance of the plan or purpose, and resulting damage.

*Von Lehn v. Astor Art Galleries, Ltd.*, 86 Misc.2d 1, 7, 380 N.Y.S.2d 532, 538 (Sup.Ct. 1976) (citations omitted). "In alleging conspiracy, the plaintiff carries the burden of proving (1) the corrupt agreement between two or more persons, (2) an overt act, (3) their intentional participation in the furtherance of a plan or purpose, and (4) the resulting damage." *Suarez v. Underwood*, 103 Misc.2d 445, 447, 426 N.Y.S.2d 208, 210 (Sup.Ct.1980).

Kashi clearly proved Gratsos' deliberate participation in an agreement between himself and his co-defendants to defraud Kashi. Gratsos is, therefore, jointly and severally liable under New York law for the damage suffered by Kashi. Gratsos' ties to the Onassis organization lent respectability to SMSC and induced Kashi to deal with the defendants. His participation was thus essential to the very initiation of the scheme in light of Kashi's refusal to deal with SGI prior to its becoming affiliated with Gratsos. The district court found that Gratsos discussed the Kashi "swindle" with Wischmann in July, 1980, and that he clearly knew of the scheme by that date. Gratsos' assurances to Kashi that the shipments would be made, his refusal to act upon learning in July, 1980 that no shipment was in fact made, and his participation in distributing the proceeds from

the second L/C all compel the conclusion that he was a full participant in the entire scheme.

The district court's legal conclusion simply does not follow from its findings of fact. It found both that Gratsos was crucial to "hooking" Kashi, and that he "knew or should have known that the L/C proceeds had been drawn down though no shipment had been made [and] nevertheless permitted Friedmann to use some L/C funds for his benefit." Nevertheless, the district court concluded that the evidence was insufficient to tie Gratsos to "the broader plan." However, Gratsos' active role in initiating the transaction, his subsequent failure to intervene upon learning that no shipment had been made, and his profiting from the fraud demonstrate his deliberate and vital role in the conspiracy. Any claim that Gratsos thought that he was dealing with legitimate businessmen in Stile, Graino, and Friedmann is belied by his later actions. After July, 1980, when he knew beyond any doubt that they were defrauding Kashi, he took no steps whatsoever to protect the latter but instead shared in the spoils. Accordingly, we reverse the judgment of the district court and find Gratsos' estate liable for the full extent of Kashi's damages arising from the second shipment.

### 2. *Liability of Friedmann*

Friedmann claims that the district court erred in finding him liable for the full extent of Kashi's damages. We disagree.

■ Chief financial officer and director of SGI, Friedmann was a central figure in the scheme. Friedmann concedes his role in dispersing the letter of credit proceeds, but argues that he was unaware of Stile and Graino's intention not to ship the grain. This is belied by his close relationship with Stile and Graino, and more importantly by his efforts after the failure to ship to bait Kashi into making incriminating statements and to trick Kashi into settling the dispute at a distress price. Friedmann first attempted to settle the dispute by promising at an October 16, 1980 meeting

to return the available cash, but then supervised the transfer of over $5 million of the L/C proceeds out of the United States. Such conduct is thoroughly inconsistent with Friedmann's claims of ignorance with respect to the fraud.

As the district court noted, "Much of the evidence as to each defendant's participation was circumstantial, but the proof was strong, and circumstantial evidence is no deficiency, especially where most participants have refused to testify by asserting their fifth amendment privilege, and where many of defendants' documents have been intentionally destroyed or withheld." The district court's imposition of liability against Friedmann for the full extent of Kashi's losses is fully supported by the record.

### 3. *The Measure of Contract Damages*

The price of corn and soybean meal, the grains to be purchased, rose in the period between the signing of the contract and the point at which Kashi became aware of the breach. Kashi claims that the district court erred in denying him recovery for any loss attributable to this price increase.

Under New York law, a frustrated buyer is entitled to recover both the purchase price paid, N.Y.U.C.C. § 2–711(1) (1964), *and* "the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in this Article (Section 2–715), but less expenses saved in consequence of the seller's breach." *Id.* § 2–713(1). In denying Kashi's request for additional damages, the district court stated: "Kashi produced no evidence ... of any attempt to cover, in the U.S. or anywhere else in the world, and the contract price he agreed to remained substantially above the market price [at the time of breach]."

■ Recovery of damages based on market price fluctuation under Section 2–713 is not, however, contingent upon the buyer's attempting to cover. Section 2–712 states that "[a] failure of the buyer to effect cover within this section does not bar him

from any other remedy," a rule evidently designed to protect a buyer such as Kashi who has already laid out substantial sums of money from having to come up with yet more cash. Kashi's failure to attempt to cover thus does not preclude his recovery of Section 2–713 damages.

■ Concluding that Kashi suffered no loss, the district court also compared the contract prices with market prices and concluded that the market price of the grains remained at all relevant times below the contract prices. However, this finding resulted from an improper comparison of the price of delivered grain with that of undelivered grain. The contract for the second shipment, signed by Kashi and Graino on April 26, 1980, states that delivery by SGCL is included in the price of the grain. The record establishes that shipping costs amounted to a substantial portion of the total contract price. For example, soybean meal closed at $165.50 per metric ton at the Chicago Board of Trade on April 28, 1980, the first trading day following the contract date, whereas Kashi agreed to pay $271.00 per metric ton. Accordingly, the conclusion that Kashi suffered no damage as a result of the price increase is clearly erroneous.

We therefore remand to the district court for additional findings of fact with regard to damages under Section 2–713.

■ In finding SMSC liable for contract damages, the district court, citing the limited liability afforded by SMSC's corporate status, declined to impose liability for such damages on SMSC's principals—Friedmann, Stile, and Gratsos. The court believed that it would have been proper to pierce the corporate veil but for Kashi's failure to prove that Gratsos was a full participant in the fraudulent scheme. We find, however, that Gratsos was fully involved and that SMSC was used to perpetrate the fraudulent scheme. The principals of SMSC paid no regard to the usual formalities attending the corporate form in the incorporation of SMSC or in distributing the spoils from the second L/C, which

were appropriated directly by the defendants. We therefore pierce the corporate veil and hold the individual defendants liable for the contract damages. *See Walter E. Heller & Co. v. Video Innovations, Inc.,* 730 F.2d 50, 53 (2d Cir.1984) (citing, *inter alia,* absence of corporate formalities and perpetration of fraud by means of corporate vehicle as relevant factors in piercing corporate veil).

### 4. *Enforcement of the Settlement Agreement*

Shortly after the initiation of this action, Kashi entered into a settlement agreement pursuant to which the district court issued a stipulation of dismissal on December 18, 1980 that removed all defendants but Wischmann, SMSC, Gratsos and Friedmann from the case.

Following the trial against the remaining defendants, Kashi filed a proposed judgment and order which requested additional relief against the settling defendants on the grounds that they had breached the settlement agreement. The district court denied this relief, noting "[t]his court is not required to enforce, and has had no trial on the propriety of enforcing, the settlement agreement entered in this case."

Kashi contends both that the settling defendants in fact breached the agreement and that the refusal to enforce the agreement was an abuse of discretion. Since we believe the refusal to enforce the agreement was a sound exercise of discretion, we do not reach the question of whether or not the agreement was in fact breached.

The settling defendants were out of this case for more than three years and were thus not able to rebut Kashi's allegations concerning its breach. Under these facts, it was well within the district court's discretion to refuse Kashi's request. Kashi is, of course, not foreclosed from suing on the agreement in a separate action.

### 5. *Friedmann's Due Process Claim*

Appellant-cross-appellee Friedmann contends that "procedural abuses" at trial deprived him of due process. Friedmann was the target of a federal grand jury investigation in September, 1982 and therefore moved to stay this trial. The district court granted this motion and delayed the trial until the U.S. Attorney's office announced that it had declined prosecution. Nonetheless, Friedmann alleges that the trial should have been stayed further since the statute of limitations for the offenses investigated had not run by the time of trial. He contends that Judge Sofaer's failure to allow this additional delay was an abuse of discretion. We disagree.

In *SEC v. Dresser Industries,* 628 F.2d 1368, 1372 (D.C.Cir.) (en banc), *cert. denied,* 449 U.S. 993, 101 S.Ct. 529, 66 L.Ed.2d 289 (1980), the D.C. Circuit noted that "the Constitution ... does not ordinarily require a stay of civil proceedings pending the outcome of criminal proceedings.... Nevertheless, a court may decide in its discretion to stay civil proceedings ... 'when the interests of justice seem ... to require such action....'" (quoting *United States v. Kordel,* 397 U.S. 1, 12 n. 27, 90 S.Ct. 763, 770, n. 27, 25 L.Ed.2d 1 (1970) (citations omitted)). The district court exercised sound discretion in staying the trial until the U.S. Attorney declined to prosecute, and in proceeding with the trial thereafter. Friedmann's reliance on *Iannelli v. Long,* 487 F.2d 317 (3d Cir.), *cert. denied,* 414 U.S. 1040, 94 S.Ct. 541, 38 L.Ed.2d 330 (1973) is misplaced, since there the civil litigant had already been indicted.

We have examined the remainder of the claims raised on this appeal and cross-appeal and have found them to be without merit. Affirmed in part, reversed in part, and remanded for additional proceedings.

IRVING R. KAUFMAN, Circuit Judge (dissenting in part and concurring in part):

I concur in the majority opinion insofar as it rejects David Friedmann's claims raised on cross-appeal, remands the issue of damages to the district court, and affirms the district court's refusal to enforce the settlement agreement. I must dissent,

however, from that part of the opinion reversing the district court and imposing full liability on Constantine Gratsos.

Motivated by an unshakeable conviction that Gratsos should be liable for the damages suffered by Kashi, my colleagues have cast aside the usual restraint exercised by appellate courts reviewing the factual findings of a lower court. In so doing, they have created liability where none exists.

My brothers properly note that in New York a civil conspiracy requires (1) an *agreement* between two or more persons, (2) an overt act, (3) an *intentional participation* in the furtherance of a plan or purpose, and (4) resulting damage. *Suarez v. Underwood*, 103 Misc.2d 445, 447, 426 N.Y.S.2d 208, 210 (Sup.Ct.1980) (emphasis added). None of the facts set forth in the majority opinion to support the existence of a conspiracy, however, establish that Gratsos knowingly engaged in a common scheme to defraud Kashi.

The district judge found that Gratsos learned of SMSC's failure to ship the grain in July, 1980, two months after the letter of credit had been cashed. Judge Sofaer also found that Gratsos shared in some of the proceeds from the letter of credit. Indeed, these facts support an action for conversion, and the district court properly held Gratsos's estate liable for $47,500.00—the amount by which Gratsos benefitted from the breach of contract.

The mere fact that Gratsos had ties to the Onassis organization, and that Kashi was induced by that affiliation to engage in business with the defendants, however, does not establish that Gratsos intended to defraud Kashi. Nor does Gratsos's silence after learning of SMSC's failure to ship the grain lead to the conclusion that he conspired from the outset to defraud Kashi. In fact, the district judge specifically found that Gratsos's joint venturers probably contracted for the second shipment without consulting Gratsos, and that Kashi failed to prove either that Gratsos knew about the breach of contract when it was committed or that Gratsos's representations about

SMSC were fraudulent. I am thus mystified how, on appeal, we can view the facts to "compel the conclusion that [Gratsos] was a full participant in the entire scheme." The district judge's holding that Gratsos was liable only to a limited extent may seem unlikely, or even improbable, but it is not clearly erroneous. *See Anderson v. City of Bessemer City*, — U.S. —, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

The majority also states that the district judge "believed that it would have been proper to pierce the corporate veil but for Kashi's failure to prove that Gratsos was a full participant in the fraudulent scheme." In fact, the district court ruled that there was no need to reach the question whether SMSC's corporate existence should be disregarded. Otherwise, however, the district court found that SMSC functioned as a legitimate corporation in previous transactions, and that the evidence did not establish that the company was formed as part of a fraudulent plan. By instructing the district court to pierce the veil of a possibly legitimate corporation, this Court departs sharply from established precedent. *Cf. Metropolitan Transportation Authority v. Triumph Advertising Productions, Inc.*, 497 N.Y.S.2d 673 (1st Dept.1986) (conclusory allegations that corporate structure is a sham are insufficient to warrant piercing corporate veil); *Walter E. Heller & Co. v. Video Innovations, Inc.*, 730 F.2d 50 (2d Cir.1984) (corporate veil pierced because jury found shell corporation was inadequately capitalized and lacked formalities of normal corporate existence); *Bartle v. Finkelstein*, 241 N.Y.S.2d 655, 19 App. Div.2d 256 (4th Dept.1963) (veil pierced upon a determination that corporation was a fictional entity).

Accordingly, I disagree with the majority recommending reversal and would affirm the district court finding that Gratsos's liability was of a limited nature. As I noted above, however, I concur in the majority's decision to reject Friedmann's cross-appeal, remand to the district court on the damages issue, and affirm the lower court's

refusal to enforce the settlement agreement.