**CLEFT OF THE ROCK FOUNDATION, Mark Andre, MA Fund, Daniel Thomson, and John Difrances, Plaintiffs,**

v.

**Robert C. WILSON, Euro Scotia Funding Limited, Euro Scotia Funding (U.S.A.), Inc., Euro Scotia Group Limited, Euro Scotia Funding (Barbados) Limited, Euro American Insurance Co., Ltd., Debenture Guaranty Corporation, Veronica**

**Canino Wilson, Samuel L. Boyd, Douglas McClain, Deborah McClain, Donald Edel, Edward Nicholas Canino, Gary Long, Robert Carter Dye, John Balazovic, Sylvia Balazovic, Peter Dale, Dieter Wicki, James Garro, Badon International Limited, Gambia Limited, Fluentventure Limited, and Alithia Company, Ltd., Defendants.**

No. CV 97–3609 ADS.

United States District Court,
E.D. New York.

Jan. 31, 1998.

Robinson, Silverman, Pearce, Aronsohn & Berman, LLP, New York, NY (James A. Altman, of Counsel), for Plaintiffs.

Samuel L. Boyd, Boyd & Assoc., Dallas, TX, Pro se.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

This diversity action is brought by the plaintiffs against the defendants—fourteen (14) individuals and interconnected companies controlled by one or more of them—for compensatory and consequential damages based upon claims of conspiracy, common law fraud, breach of fiduciary duty, constructive fraud, conversion, monies had and received, and promissory estoppel. Presently before the Court is the motion by the defendant Samuel L. Boyd ("Boyd" or the "defendant") to dismiss pursuant to Fed.R.Civ.P. 12(b)(2), for lack of personal jurisdiction.

### I. BACKGROUND

The facts set forth below are taken from the Complaint.

The plaintiffs are as follows:

1) Cleft of the Rock Foundation ("Cleft"), is a not-for-profit corporation organized under the laws of the State of New York, with a principal place of business at 16 Mystic Lane, Northport, New York. Cleft raises funds which are used to support Christian evangelical and charitable projects;

..2) Mark Andre ("Andre"), resides in Northport, New York. Andre is the president of Cleft and the managing partner of the plaintiff, MA Fund;

3) MA Fund is a general partnership organized under the laws of the State of New York, with a principal place of business at 16 Mystic Lane, Northport, New York, the same location as Cleft. Its business is investment;

4) Daniel Thomson ("Thomson") resides in Northport, New York. Thomson is Andre's son-in-law; and

5) John DiFrances ("DiFrances") resides in Dousman, Wisconsin. DiFrances is Andre's brother-in-law.

The plaintiffs allege that the defendants defrauded them of more than $3.9 million and caused Thomson more than $500,000.00 in additional damages, using primarily three fraudulent schemes. Commencing in the Summer of 1993, each of the defendants allegedly agreed and conspired with the co-defendant Robert C. Wilson ("Wilson"), a resident of Florida, and each other, to defraud the plaintiffs, to breach their fiduciary duty to the plaintiffs, to misappropriate and convert the plaintiffs' funds through three fraudulent schemes, and then to secrete and launder those funds through: Boyd's attorney trust account at Nations Bank of Texas, N.A., in Dallas, Texas; an account maintained by the defendant Debenture Guaranty Corporation ("Debenture") at the First American Bank in Knoxville, Tennessee; various offshore accounts; and other accounts currently unknown.

The primary vehicle allegedly utilized to perpetrate the conspiracy was Euro Scotia Funding, Limited ("ESFL")—a now defunct corporation organized under the laws of Nova Scotia, Canada, with its last principal place of business, upon information and belief, in Halifax, Nova Scotia—and its affiliated international corporations, namely, the defendants Euro Scotia Funding (U.S.A.), Inc. ("ESF–USA"), Euro Scotia Group Limited ("ESG"), Euro Scotia Funding (Barbados) Limited ("ESF–Barbados"), Euro American Insurance Co. Ltd ("Euro American"), and Debenture (collectively, the "Euro Scotia Group"). These transnational corporations are allegedly interconnected by Wilson's beneficial ownership and control and by other interlocking executive officers and directors. Almost all of the individual defendants were, or represented themselves as, executive officers or directors of one or more of the Euro Scotia Group's corporations. Boyd represented himself as an attorney for Wilson and those corporations.

The representations allegedly made by Edel, McClain, and Wilson to Andre and DiFrances about the Euro Scotia Group, directly and through the brochure, which laid the foundation for the schemes, were allegedly false for the following reasons:

1) the Euro Scotia Group was not a legitimate investment bank, nor well-connected with reputable and well established banks, investment consultants, and accounting firms, but rather was a vehicle for Wilson and his co-conspirators to carry out fraudulent schemes against the plaintiffs and others;

2) the funds that Andre and DiFrances entrusted, on behalf of the MA Fund, Cleft, and DiFrances, to the Euro Scotia Group's accounts for use in the Bond–Stripping Fund were not kept secure, but were immediately taken by the defendants for their own personal use and benefit;

3) with a couple of exceptions, the Euro Scotia Group's executive officers and directors listed in the brochure did not have prior work experience with prestigious international banking and investment concerns;

4) two of the private placements which the brochure claimed were arranged by ESG purportedly were made in December 1992 and April 1993, before it was even incorporated; and

5) upon information and belief, the Euro Scotia Group did not invest the monies of the MA Fund, Cleft, and DiFrances in safe, profitable investments.

The three alleged fraudulent schemes were executed as follows.

## A. Bond-Stripping Scheme

In late June 1993, Edel—who had formerly worked as a fund raiser for a Christian educational organization to which Andre had been, and continues to be, devoted to—telephoned Andre and suggested that Andre speak to the defendant, Douglas McClain

("McClain"), who managed funds for the Euro Scotia Group which, Edel allegedly represented, was a large, established investment bank with an extensive and very successful record of money management. Edel arranged for McClain to visit Andre in New York. McClain and Andre had several meetings at Andre's office and at his home on Long Island, New York, from August 23, 1993 through August 26, 1993. As a result of Edel's introduction and McClain's representations during those meetings, McClain allegedly gained Andre's trust and confidence.

During their meeting on August 23, 1993, McClain allegedly told Andre that he was Vice President of the Euro Scotia Group, an investment bank with an international clientele. McClain represented that the Euro Scotia Group managed hundreds of millions of dollars for many individual and corporate investors, including Edel, First Boston, and certain church organizations with which Andre was familiar. McClain represented that the Euro Scotia Group obtained above-market returns for its clients and itself by, among other things, following investment strategies that focused on anomalies in international capital markets. McClain assured Andre that Euro Scotia Group could provide profitable and safe investment opportunities for Andre and for Cleft and MA Fund, giving Andre a copy of the Euro Scotia Group's brochure.

On that same day, McClain advised Andre that the Euro Scotia Group had developed a high return bond investment program, which McClain called a Bond–Stripping Fund. McClain allegedly represented that the Bond–Stripping Fund yielded a minimum of 60%, and perhaps as high as 230%, per year return with virtually no risk. McClain explained that the bond-stripping program achieved such remarkable returns by repeating over leveraged trades capitalizing on the incremental differences in interest rates for short-term and long-term bonds. McClain allegedly represented to Andre that the Bond–Stripping Fund was managed by Pauli & Co., Inc., a broker-dealer in St. Louis, Missouri, but that the trades would clear through Bear Stearns & Co. ("Bear Stearns") in New York. He represented that the accounting for the Bond–Stripping Fund would be handled by Ernst & Young in Barbados.

Although Andre allegedly did not understand the intricacies of the Bond–Stripping Fund, he trusted McClain and relied upon his representations. On or about the evening of August 23, 1993, Andre advised McClain that he would transfer funds that he managed in the MA Fund and Cleft to the Euro Scotia Group to invest in its Bond–Stripping Fund. On or about August 26, 1993, shortly before he was to leave for the airport, McClain presented Andre with a letter dated August 25, 1993, written on the Euro Scotia Group letterhead and signed by McClain as "Vice President." This letter purported to confirm the agreements and discussions that they had had over the past two days, which the letter represented had been incorporated into two subscription agreements for profit-sharing notes which accompanied the letter. In the letter, McClain represented that "[b]oth Cleft and the MA Fund will receive a minimum of 35% annual rate of return credited by Euro Scotia Funding Limited's investment strategies." Complaint ¶ 57. Other than signing the two subscription agreements, one committing the MA Fund and Cleft to deposit $1 million and $500,000.00, respectively, into the Bond–Stripping Fund, Andre also signed a Bear Stearns authorization giving Wilson trading authority for, and appointing him as attorney-in-fact with power over, the funds of MA Fund and Cleft to be placed in the Bond–Stripping Fund. Relying on Edel and McClain's representations about the Euro Scotia Group and the Bond–Stripping Fund, and following instructions given to him by either McClain or Wilson, from on or about September 7, 1993 through November 15, 1993, Andre deposited funds belonging to the MA Fund and Cleft to their respective subaccounts in ESFL's account at Bear Stearns for investment in the Bond–Stripping Fund. Thus, by March 15, 1994, the Euro Scotia Group had received $221,673.48 from Cleft, $1,561,465.33 from MA Fund for investment in the Bond–Stripping Fund. In addition, on or about March 15, 1994, DiFrances wire-transferred approximately $60,000.00 to the Euro Scotia Group's bank account at Bar-

clay's Bank in New York for investment in the Bond–Stripping Fund.

The plaintiffs allege that the Euro Scotia Group did not operate any bond-stripping fund. Indeed, the Euro Scotia Group transferred funds they received from the MA Fund, Cleft, Andre, and DiFrances for the Bond–Stripping Fund to other Euro Scotia Group accounts and, upon information and belief, to Boyd's attorney trust account and other accounts. These transfers were made in order to secrete and launder these monies and to accomplish other objective of the Euro Scotia Group, Wilson, and other co-conspirators.

On or about January 23, 1995, Wilson allegedly told DiFrances that the Bond–Stripping Fund had made substantial gains for DiFrances and that Wilson would have Euro Scotia Group return to DiFrances the funds taken from him and the profits in the Bond–Stripping Scheme. Wilson told DiFrances to call the defendant Peter Dale ("Dale") with wiring instructions. On or about January 24, 1995, Dale obtained from DiFrances instructions to transfer funds back to him, but no such transfer was made.

In Spring 1995, the Euro Scotia Group began to have talks with Andre, Thomson, and DiFrances about a global settlement of claims that the plaintiffs had initiated against the defendants. On or about May 17, 1995, Thomson telephoned the defendant John Balazovic ("Balazovic") and asked him to obtain statements for the Cleft and MA Fund subaccounts at Bear Stearns. Balazovic allegedly told Thomson that he would ask Wilson about obtaining such statements and would inquire about the subaccounts. Later that day, Balazovic spoke by telephone with Thomson and attempted to assuage Thomson's concerns about the funds in the subaccounts by representing that the funds had been withdrawn a couple of days before in anticipation of the effort to settle their dispute with the plaintiffs. However, the plaintiffs learned that this was false. On or about May 16, 1995, Chris Pauli, a principal of Pauli & Co. in St. Louis, informed Thomson during a telephone conversation that the Cleft and MA Fund subaccounts did not contain any funds and that those accounts had

not had any activity in the prior six months. Thus, the funds of Cleft and MA Fund at Bear Stearns had been withdrawn at least six months before, and not just recently in anticipation of the settlement, as Balazovic had represented to Thomson.

On or about June 2, 1995, Wilson faxed Andre a letter in which he represented to Andre that he would make available to him all the monies that he had sent to the Euro Scotia Group in connection with the three schemes as soon as certain transactions were closed. The plaintiffs allege that no such monies were ever made available to Andre, Cleft, MA Fund, or Thomson. Despite numerous requests, none of the monies transferred on behalf of Cleft, MA Fund, Andre and DiFrances to the Euro Scotia Group for investment in the Bond–Stripping Fund were returned to any of them, except for $20,000.00 returned to DiFrances during the Summer of 1994.

## B. Tri–Northern Scheme

On or about January 12, 1994, Andre spoke on the telephone with both Wilson and McClain. During that conversation, Wilson and McClain allegedly urged Andre to invest in Resources, Inc. f/k/a Hockey Hose Athletics, Inc. ("Tri–Northern"), which Wilson and McClain represented to be a corporation with extremely valuable, exclusive rights to mine the world's largest reserve of wallastonite, an environmentally sound substitute for asbestos, in British Columbia, Canada. Wilson represented to Andre: (1) that shares of Tri–Northern were available through a private placement at $3/share; (2) that Tri–Northern was about to be listed on the Alberta Stock Exchange; (3) that the initial public offering price would be, at minimum, $6 per share, and that thereafter the price per share would greatly appreciate. On or about January 13, 1994, Andre telephoned Edel inquiring about Tri–Northern. Edel allegedly advised Andre that he was familiar with Tri–Northern, that he had purchased shares of Tri–Northern, and that he viewed the purchase of Tri–Northern stock through the private placement as a wonderful investment opportunity. Relying on the representations made by Wilson, McClain and Edel, Andre caused Cleft

and the MA Fund to wire transfer approximately $1 million and $650,000.00, respectively, to the ESF–USA account at the First National Bank of Loudon County for the purchase of Tri–Northern stock.

In addition, in or about late December 1993, Wilson telephoned Thomson at his office in Manhattan and also offered Thomson the opportunity to purchase Tri–Northern shares by private placement. During that telephone conversation, Wilson represented to Thomson: (1) that Tri–Northern was backed by one of the wealthiest families in Canada; (2) that Tri–Northern was to be listed on the Alberta Stock Exchange in early January 1994; (3) that the price would increase dramatically as soon as Tri–Northern was listed; and (4) that the purchase of Tri–Northern stock was a virtually risk-free investment. In reliance on these and prior representations about the Euro Scotia Group, Thomson wire-transferred $100,-000.00 to ESF–USA's account at First National Bank in Loudon County. During a telephone conversation in or about January 1994, Thomson inquired of McClain why Tri–Northern had not yet been listed on the Alberta Stock Exchange. McClain allegedly replied that the Exchange had requested additional information, but he assured Thomson that the listing was imminent. Relying on these and prior representations, Thomson wire-transferred $200,000.00 to ESFI's account at Toronto Dominion Bank for the purchase of Tri–Northern stock.

Andre had allegedly conveyed Edel and McClain's representations about the Euro Scotia Group and Tri–Northern, to DiFrances. In reliance thereof, DiFrances transferred $40,000.00 to the Euro Scotia Group's bank account at First National Bank of Loudon County for purchase of Tri–Northern stock. Shortly after March 10, 1994, McClain caused DiFrances to authorize utilizing $10,000.00 previously invested by DiFrances in the Bond–Stripping Fund to be used for the purchase of Tri–Northern stock.

On or about April 7, 1994, Wilson sent via facsimile a memorandum to Andre at his office on Long Island, New York, in which Wilson represented that Tri–Northern would go public during the week of April 25, 1994.

On numerous occasions after April 7, 1994, Wilson, Edel, and Wilson re-assured Andre, Thomson, and DiFrances that Tri–Northern would be listed soon on the Alberta Stock Exchange. On or about November 28, 1994, Thomson telephoned Edel for a status on the Tri–Northern listing. Edel allegedly informed Thomson that the listing had been delayed because Tri–Northern owed $1 million in unpaid bills but that the bills had been recently paid, that the responsibility for listing Tri–Northern had been delegated to Balazovic and that Balazovic would accomplish this soon. On or about November 29, 1994, Edel verified that Thomson had a $300,000.00 investment reflecting 100,000 shares of Tri–Northern.

The representations about Tri–Northern were allegedly false. Tri–Northern: (1) was already a public company which had been struck off the Alberta Registries Corporate Registry; (2) was insolvent; (3) was subject to a cease trade order from the Alberta Securities Commission; and (4) had virtually worthless stock. None of the millions of dollars the plaintiffs had allegedly earmarked for the purchase of Tri–Northern stock was ever used to purchase that stock on their behalf. Despite repeated requests, neither Andre, Thomson nor DiFrances was ever provided with confirmations of their purchase of Tri–Northern stock, or with monthly statements from the Euro Scotia Group, Pauli & Co., or Bear Stearns indicating their purchase of Tri–Northern stock. After repeated requests by both Andre and Thomson for stock certificates evidencing the plaintiffs' ownership of Tri–Northern stock, on or about May 27, 1994, Wilson caused documents purporting to be Tri–Northern stock certificates to be sent to Andre and Thomson. Upon information and belief, these certificates were fraudulent.

On or about January 23, 1995, a meeting was held at one of Andre's business offices on Long Island, New York. Present were Andre, Thomson, DiFrances, Wilson, the defendant Veronica Canino Wilson ("V.Wilson"), McClain, their attorney, John Burns, III, Esq., and others. During the meeting, Wilson represented that within three weeks Tri–Northern would merge with Prairie Pa-

cific, a NASDAQ-traded company, and that as a result, Tri–Northern shares would increase in value to between $50 to $100 per share. However, no such merger occurred and, upon information and belief, no such merger was ever intended.

In a series of letter addressed to Cleft, MA Fund, Thomson, and DiFrances beginning in or about February 1995 and continuing through June 1995, Wilson, as representative of the Euro Scotia Group, offered to buy back their Tri–Northern stock for $3.50 per share. By letter dated May 12, 1995, Boyd, on behalf of ESF, Wilson and their affiliates and associates, wrote to Andre and Di-Frances, representing that they were willing to rescind the plaintiffs' purchase of Tri-Northern stock and that the plaintiffs' funds would be distributed on May 16, 1995. However, no such distribution occurred and, upon information and belief, no such distribution was ever intended. The repeated offers to buy back the plaintiffs' Tri–Northern stock and repeated representations that the plaintiffs' would soon receive back their funds, allegedly never came to fruition.

### C. NATK Scheme

In or about mid-November 1993, Wilson allegedly telephoned Andre, recommending investment in North American Technologies Group, Inc. ("NATK"), a corporation trading on NASDAQ. During the telephone conversation, Wilson represented to Andre that he could make substantial profit on the purchase of NATK stock because NATK was using a new environmental technology. Wilson stated that Andre could purchase NATK shares on the open market at $3 per share and recommended that Andre send funds to the Euro Scotia Group to effectuate such a purchase. Relying on Wilson's representations about NATK as well as the prior representations about the Euro Scotia Group, Andre sent $100,000.00 to ESFL's account at Royal Bank of Canada, for the purchase of NATK stock for his personal account. Upon information and belief, the Euro Scotia Group never purchased NATK stock for Andre. Despite Andre's repeated requests to Wilson and McClain beginning in December 1993, Andre never received any NATK stock certificates or confirmation that NATK stock was purchased for his own account.

### D. Thomson's job offer

Finally, during a telephone conversation in or about January 1994, McClain allegedly offered Thomson a lucrative job as a manager with the Euro Scotia Group. During that telephone conversation, McClain also represented that Thomson would have to sell his partnership in Alpine Oil Corporation ("Alpine") to avoid any conflict of interest. During 1993, Thomson earned approximately $300,000.00 from his majority ownership in Alpine.

During the end of January 1994, McClain visited Thomson at his home and allegedly reiterated the job offer and its terms. McClain allegedly repeatedly stated that Thomson must sell his majority ownership interest in Alpine by the end of February to begin work on March 1st. Relying on McClain's offer, Thomson sold his interest in Alpine by February 28, 1994. However, the Euro Scotia Group never fulfilled its alleged promise to hire Thomson.

## II. DISCUSSION

### A. Self representation

In addressing Boyd's motion, the Court is mindful that he is proceeding *pro se* and that, usually, *pro se* submissions "must be 'liberally construed' in favor of the ... [defendant] and held to 'less stringent standards than formal pleadings drafted by lawyers.'" *Hughes v. Rowe*, 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) (per curiam) (citing *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)). However, in this case, Boyd is an attorney duly licensed to practice in Texas and is utilizing the resources of his law firm, Boyd & Associates, to defend this lawsuit. Therefore, the Court finds that the usual *pro se* rules do not apply to the defendant, Boyd.

### B. Standard of review

In a motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(2) for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that the court has

jurisdiction over the defendant. *Chaiken v. VV Publishing Corp.*, 119 F.3d 1018 (2d Cir. 1997) (citing *Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 566 (2d Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 508, 136 L.Ed.2d 398 (1996)); *Koehler v. Bank of Bermuda Limited*, 101 F.3d 863, 865 (2d Cir.1996). Prior to discovery, a plaintiff may defeat such a motion with legally sufficient allegations of jurisdiction. *Id.* The Second Circuit discussed the standard for evaluating personal jurisdiction as follows:

> To survive the motion to dismiss, [the plaintiff] was required to make only a prima facie showing that [the defendant] was amenable to personal jurisdiction in New York. *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir.1981). Eventually personal jurisdiction must be established by a preponderance of the evidence, either at an evidentiary hearing or at trial. But where the issue is addressed on affidavits, all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party. *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 57 (2d Cir.1985); *see Ball v. Metallurgie Hoboken–Overpelt, S.A.*, 902 F.2d 194, 196–98 (2d Cir.) (discussing procedure for challenging personal jurisdiction), *cert. denied*, 498 U.S. 854, 111 S.Ct. 150, 112 L.Ed.2d 116 (1990).

*A.I. Trade Finance, Inc. v. Petra Bank*, 989 F.2d 76 (2d Cir.1993).

Personal jurisdiction over a non-resident defendant in a federal diversity action is determined by the law of the forum state. *Id.*; *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir.1986); *Hoffritz for Cutlery, Inc. v. Amajac Ltd.*, 763 F.2d 55, 57 (2d Cir.1985). Thus, in resolving questions of personal jurisdiction in a diversity action,

a district court must conduct a two-part inquiry. First, it must determine whether the plaintiff has shown that the defendant is amenable to service of process under the forum state's laws; and second, it must assess whether the court's assertion of jur-

isdiction under these laws comports with the requirements of due process.

*Metropolitan Life Ins.*, 84 F.3d at 567.

In the present case, since no discovery on the issue of personal jurisdiction has been conducted, the plaintiffs must merely make a *prima facie* showing supported by an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over Boyd. *Ball*, 902 F.2d at 197.

### C. Boyd's motion

#### 1. Long-arm jurisdiction

A court has personal jurisdiction over a non-domiciliary defendant in a civil action if it can exercise either general or specific jurisdiction over his person. A court has general jurisdiction over a non-domiciliary defendant where the defendant maintains "continuous and systematic" contacts with the forum state. *McGowan v. Smith*, 52 N.Y.2d 268, 272, 437 N.Y.S.2d 643, 645, 419 N.E.2d 321 (1981). A court has specific jurisdiction over a defendant when his conduct falls within one of the categories set forth in the forum state's long-arm statute. The plaintiffs contend that personal jurisdiction is conferred upon Boyd pursuant to New York's long arm statute, N.Y. C.P.L.R. § 302(a)(2) ("Section 302(a)(2)"), which provides as follows:

> (a) Acts which are the basis of jurisdiction. As to a cause of action arising from any of the acts enumerated in this section, a court may exercise jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:
>
> * * *
>
> 2. commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act . . . .

A co-conspirator may be an "agent" as that term is used above. *Grove Press, Inc. v. Angleton*, 649 F.2d 121, 122–23 (2d Cir.1981). Indeed, "[i]t is well established under New York law that 'the acts of a co-conspirator within the state may be attributed to an out-of-state defendant for the purposes of obtaining jurisdiction.'" *Madanes v. Madanes,*

981 F.Supp. 241 (S.D.N.Y.1997) (citing *Sierra Rutile Ltd. v. Katz,* No. 90 CIV. 4913, 1992 WL 236208, at \*8 (S.D.N.Y. Sept. 8, 1992)). However, "the bland assertion of conspiracy or agency is insufficient to establish jurisdiction for the purposes of section 302(a)(2)." *Lehigh Valley Industries, Inc. v. Birenbaum,* 527 F.2d 87, 93–94 (2d Cir.1975). Before long-arm jurisdiction can be exercised over an out-of-state co-conspirator, the plaintiff must demonstrate (1) a prima facie factual showing of a conspiracy to commit a tort in New York, and (2) allege specific facts warranting the inference that the defendant was a member of the conspiracy. *Chrysler Capital Corp. v. Century Power Corp.,* 778 F.Supp. 1260, 1266 (S.D.N.Y.1991).

### a. *Prima facie showing of a conspiracy*

■ To plead a cause of action for conspiracy, the plaintiffs must allege the primary tort and the following four elements:

1. a corrupt agreement between two or more parties;

2. an overt act in furtherance of the agreement;

3. the parties intentional participation in the furtherance of the plan or purpose; and

4. the resulting damage or injury.

*Kashi v. Gratsos,* 790 F.2d 1050, 1055 (2d Cir.1986); *Chrysler Capital Corp.,* 778 F.Supp. at 1267.

■ In the Court's opinion, the plaintiffs have alleged the existence of an agreement intentionally to use deception, namely, misrepresentations, in an effort to misappropriate the plaintiffs' funds, thereby causing injury. First, the plaintiffs allege a corrupt agreement to defraud and take the plaintiffs' money. In this regard, the plaintiffs allege the defendants' participation in the Bond–Stripping Scheme, the Tri–Northern Stock Scheme, and the NATK Stock Scheme. They further allege that the defendants fraudulently induced Thomson to leave his job and sell his partnership in Alpine to accept an offer of employment with the Euro Scotia Group. All four schemes share a common denominator—a misrepresentation that the Euro Scotia Group was a legitimate and well-established investment bank associated with well-known and reputable banks, brokerage houses, investment advisers, investment counselors, and accounting firms that provided expert investment advice and financial services, such as private placements of securities. The plaintiffs contend that McClain, Wilson, and the other defendants utilized the Euro Scotia Group to weave a web of corporate facade to defraud, launder and secrete their money.

The Court further finds that the plaintiffs have alleged the other elements of a conspiracy. The plaintiffs allege that in furtherance of the conspiracy, the defendants sent misleading communications and committed numerous additional overt acts. For example, after being introduced to McClain by Edel, McClain and Andre allegedly had several meetings at Andre's office and at his home on Long Island, New York, from August 23, 1993 through August 26, 1993. Two subscription agreements and a Bear Stearns trading authorization had been signed by Andre for the Bond–Stripping Scheme. With regard to the Tri–Northern Scheme, the plaintiffs allege that numerous communications occurred between Andre, Thomson, Wilson and McClain during which, Andre and Thomson were encouraged to purchase Tri–Northern stock. The plaintiffs further allege that Wilson contacted Andre, recommending investment in NATK stock. Boyd is alleged to have laundered some proceeds of this fraud through his attorney trust account. When the plaintiffs allegedly became suspicious and requested an accounting, the defendants allegedly continued their masquerade by written and verbal communications beginning in 1995, to reassure the plaintiffs that they would realize their investments or that the money invested would be returned.

The defendants' intentional participation in furtherance of the conspiracy could be inferred from the overt acts taken by them. *See Andre Emmerich Gallery, Inc. v. Segre,* No. 96 CIV. 889, 1997 WL 672009, at \*5 (S.D.N.Y. Oct.29, 1997) ("Defendants' intentional participation in furtherance of the plan could be inferred from the letter that defendant sent to [the plaintiff].").

The Court finds that the last element is satisfied since the plaintiffs claim to have

suffered financial loss, totaling approximately $4 million, from the alleged schemes. The Court finds that these allegations establish, for the purposes of this motion, at this point in the litigation, a corrupt agreement and the defendants' intentional participation in furtherance of the agreement.

Finally, the Court notes the oft-cited proposition in conspiracy law that a conspiracy can rarely be proved by direct evidence, and is instead

> "usually established by circumstantial evidence based upon independent proof of each alleged co-conspirator's acts, conduct and statements and the totality of conduct of all the participants and the reasonable inference to be drawn therefrom."

*Grosser v. Commodity Exchange, Inc.*, 639 F.Supp. 1293, 1310 (S.D.N.Y.1986) (citation omitted). "For this reason, the Second Circuit has held that in a case where the plaintiff has submitted evidentiary facts tending to connect the defendant to New York transactions, the conspiracy/jurisdictional issue should not be resolved and the complaint dismissed without discovery." *Sierra Rutile Ltd. v. Katz*, No. 90 Civ. 4913, 1992 WL 236208, at *8 (S.D.N.Y. Sept. 8, 1992) (citing *Leasco Data Processing Equipment Corp. v. Maxwell*, 468 F.2d 1326, 1343–44 (2d Cir. 1972)).

b. *Relationship between Boyd and the alleged conspiracy*

To demonstrate that Boyd has sufficient connections with the alleged tortious acts of the co-defendants in New York, the plaintiffs must show that "(1) the out-of-state co-conspirator had an awareness of the effects of the activity in New York, (2) the New York co-conspirators' activity was for the benefit of the out-of-state conspirators, and (3) that the co-conspirators in New York acted at the behest of or on behalf of, or under the control of the out-of-state conspirators." *Heinfling v. Colapinto*, 946 F.Supp. 260, 265 (S.D.N.Y.1996) (citing *Chrysler Capital Corp.*, 778 F.Supp. at 1269).

■ The plaintiffs maintain that the communications between the parties allege a sufficient nexus to New York. Telephone calls placed, and letters mailed from, outside the state into New York do not constitute tortious acts committed "within the state" for purposes of § 302(a). *Heinfling*, 946 F.Supp. at 264 (citing cases). However, the plaintiffs do allege, among other things, that McClain met with the plaintiff in Long Island, New York, between August 23, 1993 through August 26, 1993, during which time Andre signed two subscription agreements and a Bear Stearns trading authorization in connection with the Bond–Stripping Scheme. They allege that McClain made misrepresentations at those meetings. With regard to the Tri–Northern Scheme, the plaintiffs allege that on or about January 23, 1995, a meeting was held at one of Andre's offices on Long Island, New York. Present at that meeting were Andre, Thomson, DiFrances, Wilson, V. Wilson, McClain, and the defendants' attorney, John Burns, III, Esq. The plaintiffs allege that misrepresentations that Tri–Northern would merge with Prairie Pacific and that as a consequence, Tri–Northern shares would increase in value, were made during that meeting. Such misrepresentations do constitute torts within the state. *Goland v. Iglesias*, No. 85 CIV. 9697, 1988 WL 42052, at *4 (S.D.N.Y. April 21, 1988) (citations omitted).

However, Boyd asserts that the plaintiffs are unable to demonstrate a sufficient relationship between the conspiracy and himself to warrant the inference that he was a member of the conspiracy. Boyd maintains that he could not have been a member of the alleged conspiracy "because at the time of Plaintiffs' decisions to invest, as well as their actual investments, Boyd neither knew nor had any contacts with any plaintiff, Wilson or any of Wilson's related entities." Motion to Dismiss ¶ 5. The Court finds this argument unavailing.

The Court finds that the plaintiffs have alleged facts sufficient to establish Boyd's co-conspirator status for purposes of conferring personal jurisdiction. The plaintiffs allege that the conspiracy was of a continuing nature. The plaintiffs allege that Boyd facilitated the conspiracy by laundering the proceeds of the scheme through his attorney trust account. Hence, they allege Boyd's role in a integrated conspiracy, with him

supplying a critical and necessary part in the overall scheme to defraud.

The plaintiffs further allege that Boyd communicated with the plaintiffs in May 1995 which communications were allegedly designed to "vouch for Defendants' *bona fides,* to assuage Plaintiffs' concerns about being repaid, to convince them to continue to 'play ball' with Defendants and not to interfere with Defendants' activities by, for example, complaining to criminal authorities." Affidavit of Mark O. Andre in Opposition to Motion to Dismiss ("Andre Aff.") ¶ 91. The plaintiffs further allege that Boyd benefitted from the alleged wrongdoing by allegedly using some proceeds of the scheme to pay off the mortgage note on his home which was more than $280,000.00 in default. The bank then allegedly sold and conveyed the note and the lien on Boyd's home to ESF–Barbados. If the plaintiffs' allegations are true, it can be inferred that Boyd knew the fraudulent schemes would impose injury on the plaintiffs, four of whom are residents of the State of New York, and that the tortious activity in New York was intended to advance the objectives of the defendants.

The Court finds that these allegations suffice to demonstrate that Boyd's efforts to allegedly launder the proceeds of the alleged fraudulent schemes were on behalf of and to the benefit of all the defendants, including Boyd.

In addition, the Court finds that it is of little consequence that Boyd may have joined the alleged conspiracy after the overt acts in New York had been committed and after the plaintiffs had invested money in the alleged fraudulent schemes. Boyd's alleged "joining of the conspiracy, adoption of its goals, and action in furtherance of it, thus constituted a ratification of those acts already committed with the purpose of accomplishing the same goal." *Dixon v. Mack,* 507 F.Supp. 345, 350 (S.D.N.Y.1980) (plaintiff made the necessary *prima facie* factual showing that the defendant was a member in the conspiracy where defendant joined conspiracy with knowledge that overt acts in furtherance of the conspiracy had already taken place in New York). Boyd's "knowing ratification of acts committed in New York constitutes an awareness of the ramifications or effects in New York of his own activity as a co-conspirator." *Id.* In addition, the Court notes that "it is black letter conspiracy law that one who joins a conspiracy in progress ratifies all that has come before." *Id.* at 350–51. Thus, considering the pleadings and the affidavits in the light most favorable to the plaintiffs, the Court concludes that the plaintiffs have alleged a sufficient relationship between Boyd and the conspiracy.

### 2. *Due process considerations*

Finally, exercise of personal jurisdiction over Boyd must comport with "traditional notions of fair play and substantial justice" as expressed in the due process clause of the Fourteenth Amendment. *McGee v. Int'l Life Ins. Co.,* 355 U.S. 220, 222, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957) (citing *Int'l Shoe Co. v. State of Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945)). "By requiring 'fair warning' that an individual's activities in a state may subject him to suit there, the Due Process Clause protects that person's liberty interest and 'gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.'" *Metropolitan Life Ins.,* 84 F.3d at 567 (citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 471–72, 105 S.Ct. 2174, 2182, 85 L.Ed.2d 528 (1985)).

The due process requirement has two components: the "minimum contacts" inquiry and the "reasonableness" inquiry. Minimum contacts with the forum state ensure that a "defendant has sufficient contacts with the forum state to justify the court's exercise of jurisdiction." *Id.* The "reasonableness" inquiry requires that a court evaluate the following factors: (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substan-

tive social policies. *Asahi Metal Industry Co., Ltd. v. Superior Court of California, Solano County,* 480 U.S. 102, 113–14, 107 S.Ct. 1026, 1032–33, 94 L.Ed.2d 92 (1987).

The Court finds that exercise of jurisdiction comports with the due process requirement. "By joining the conspiracy with the knowledge that overt acts in furtherance of the conspiracy had taken place in New York, [the defendant] purposely [availed himself] of the privilege of conducting activities within the forum state." *Dixon,* 507 F.Supp. at 352. Indeed, "[t]he defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there." *Id.* As such, although Boyd resides and does business in Texas, the Court finds that the plaintiffs have alleged minimum contacts with New York.

The Court further finds that it is "reasonable" to bring this litigation in New York. First, New York has an undeniable interest in providing redress to its own citizens. Four of the five plaintiffs are residents of the State of New York. The locus of the tort is in New York. The tortious acts that serve as the basis for this lawsuit, specifically, the initial meetings in August 1993 which laid the foundation for the defendants' alleged fraudulent schemes, occurred in New York. The injury to the plaintiffs occurred in New York.

Boyd also contends that the plaintiffs have filed suits arising from the same operative facts in Texas and Arizona. Hence, Boyd maintains that "by their voluntary action of seeking-out a Texas forum, Plaintiffs have undisputedly conceded that no claims exist which they could not otherwise bring in their Texas case where jurisdiction is not an issue." Motion to Dismiss ¶ 6. With respect to the plaintiff's action in Texas which the plaintiffs contend was withdrawn, the Court notes that the allegations may be similar but the relief requested is different. In that action, the plaintiffs are requesting that a lien on Boyd's house, and a constructive trust over the mortgage note, be placed. Merely because the plaintiffs have brought actions in other jurisdictions does not bar the exercise of jurisdiction by this Court. The Court fails to see how the plaintiffs' interests in proceeding in a convenient forum would be better served by litigating in another state.

The plaintiff acknowledges the burden on Boyd of defending a law suit in New York. However, "the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago." *Metropolitan Life Ins.,* 84 F.3d at 574. Hence, the Court concludes that this factor, alone, "falls short of overcoming the [plaintiffs'] threshold showing of minimum contacts." *Id.*

Furthermore, Boyd has not suggested, much less shown, any substantive social policies, or how the interstate judicial system's interest in obtaining the most efficient resolution of the controversy, would be furthered by permitting this case to be heard in Texas or in another forum.

In sum, the Court finds that the due process requirement is properly met in the present case.

### III. CONCLUSION

Having reviewed the submissions of all parties and heard oral argument, for the reasons set forth above, it is hereby

**ORDERED,** that the defendant Samuel L. Boyd's motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(2), for lack of personal jurisdiction, is **DENIED,** without prejudice with leave to renew after the close of discovery.

**SO ORDERED.**